283 So.2d 1 (1973)
STATE of Florida, Appellant,
v.
Carl DIXON et al., Appellees.
STATE of Florida, Plaintiff,
v.
Samuel D. SETSER, Defendant.
STATE of Florida, Plaintiff,
v.
Fred Elson HUNTER and James Calvin Moore, Defendant.
STATE of Florida, Plaintiff,
v.
Richard L. SHEPPARD, Defendant.
Nos. 43521, 43460, 43478 and 43473.
Supreme Court of Florida.
July 26, 1973.
Rehearing Denied October 10, 1973.
*2 Robert L. Shevin, Atty. Gen., Raymond L. Marky and George R. Georgieff, Asst. Atty. Gens., for appellant and plaintiff.
Phillip A. Hubbart, Public Defender, Lewis S. Kimler and Bennett H. Brummer, Asst. Public Defenders, for appellee-Dixon.
Leonard R. McMillen, of Stephens & McMillen, Miami, for appellee-Lester.
Ronald S. Guralnick, of Guralnick & Gellman, Miami, for appellee-Sawyer.
Louis R. Bowen, Jr. and Phillip A. Hubbart, Public Defenders, Warren H. Horton, Lewis S. Kimler and Bennett H. Brummer, Asst. Public Defenders, for defendant-Setser.
Louis O. Frost, Jr., Public Defender, and Charles C. Adams, Asst. Public Defender, for defendant-Hunter.
Elliot Zisser, of Zisser & Zisser, Jacksonville, for defendant-Moore.
Philip Carlton, Jr., Miami, for defendant-Sheppard.
Tobias Simon, Miami, Jack Greenberg, Jack H. Himmelstein, Elaine R. Jones, Lynn Walker, New York City, Anthony G. Amsterdam, Stanford, Cal., for amicus curiae N.A.A.C.P. Legal Defense and Educational Fund, Inc.
James T. Russell, Clearwater, and David H. Bludworth, West Palm Beach, for amicus curiae, Florida Pros. Attys. Ass'n, Inc.
ADKINS, Justice.
These cases pose several questions arising from the possibility of the imposition of the penalty of death pursuant to Fla. Stat. § 921.141, F.S.A., which became effective December 8, 1972.
Four cases are here consolidated on the issue of the constitutionality of the capital punishment statutes of the State of Florida. The case of State v. Setser is before this Court on the basis of a certified question from the Circuit Court of Dade County. The case of State v. Hunter and Moore is before this Court on the certified question of the Circuit Court for Duval County. The case of State v. Sheppard is before this Court on the certified question of the Circuit Court for Orange County. We have jurisdiction to determine the questions certified pursuant to Fla. Const., *3 art. V, § 3(b)(3), F.S.A. The case of State v. Dixon, Lester and Sawyer is before this Court on appeal from a decision of the Circuit Court for Dade County that Fla. Stat. §§ 775.082, 921.141, F.S.A., are unconstitutional. We have jurisdiction pursuant to Fla. Const., art. V, § 3(b)(1), F.S.A.
The question certified in the case of State v. Setser is:
"Whether the provisions of Chapter 72-724, Laws of Florida, 1972, prescribing the method and means of determining the penalty to be imposed in a capital case violates the Constitution of the State of Florida and the Constitution of the United States in light of the decision of the United States Supreme Court in the case of Furman v. Georgia, 408 U.S. 238, 32 [33] L.Ed.2d 346, 92 S.Ct. 2726 (1972), and the decision of the Supreme Court of Florida in Donaldson v. Sack, (Florida 1972), 265 So.2d 499."
In the case of State v. Hunter and Moore, the questions certified are:
"1. Whether the new Florida Murder Statute, Ch. 72-724, Laws of Florida (1972) amending Florida Statute sections 782.04 and 921.141, is unconstitutionally vague in violation of the due process and equal protection guaranteed by the Constitutions of the United States and of the State of Florida because a grand jury when called upon to consider bringing an indictment would be unable to distinguish the language between Murder in the First Degree and Murder in the Second Degree.
"2. Whether the new Florida Murder Statute, Ch. 72-724, Laws of Florida (1972), amending Florida Statute sections 782.04 and 921.141, is unconstitutionally vague in violation of the due process and equal protection guaranteed by the Constitutions of the United States and of the State of Florida because a trial judge cannot determine what specific crimes are embodied within the divisions of Murder in the First Degree and Murder in the Second Degree in order to properly instruct a jury and conduct a trial under the requirements set forth by the Supreme Court of Florida in State v. Washington, 268 So.2d 901 (Fla. 1972)."
In the case of State v. Sheppard, the questions certified are:
"Whether the provisions of Florida Statutes 782.04, 775.082 and 921.141 prescribing the penalties for felonies and misdemeanors, the definitions of the degrees of murder and the methods and means of determining the penalty to be imposed upon conviction or adjudication of guilt of a defendant of a capital felony:
"A. Is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States?
"B. Is an arbitrary infliction of punishment as to deprive the defendant of life, liberty or property without due process of law?
"C. Is guided by insufficient and arbitrary standards which are vague, indefinite and uncertain as to be contrary to the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States and Section 12 of the Declaration of Rights of the Constitution of the State of Florida?
"D. Is vague, ambiguous and indefinite as to deprive the defendant of his right to know the nature of the charges, the differentiation between the degrees of homicide and to be able to prepare a defense accordingly?
"E. Is placing upon the defendant the burden of proving mitigating circumstances in violation of his right *4 against self-incriminating as provided in the Fifth Amendment to the Constitution of the United States?"
The statutes involved in the questions before this Court are Fla. Stat. §§ 775.082, 782.04, and 921.141, F.S.A. Fla. Stat. § 775.082, F.S.A., deals with penalties for criminal convictions and provides, in pertinent part:
"(1) A person who has been convicted of a capital felony shall be punished by life imprisonment and shall be required to serve no less than twenty-five (25) calendar years before becoming eligible for parole unless the proceeding held to determine sentence according to the procedure set forth in section 921.141 results in findings by the court that such person shall be punished by death, and in the latter event such person shall be punished by death."
Fla. Stat. § 782.04, F.S.A., the statute under which all the accuseds before this Court are charged, deals with the crime of murder and provides:
"(1)(a) The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a distructive device or bomb, or which resulted from the unlawful distribution of heroin by a person over the age of seventeen (17) years when such drug is proven to be the proximate cause of the death of the user shall be murder in the first degree and shall constitute a capital felony, punishable as provided in § 775.082.
"(b) In all cases under this section the procedure set forth in section 921.141 shall be followed in order to determine sentence of death or life imprisonment.
"(2) When perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, except as provided in subsection (1), it shall be murder in the second degree and shall constitute a felony of the first degree, punishable by imprisonment in the state prison for life, or for such term of years as may be determined by the court.
"(3) When perpetrated without any design to effect death, by a person engaged in the perpetration of or in the attempt to perpetrate any felony, other than arson, rape, robbery, burglary, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, it shall be murder in the third degree and shall constitute a felony of the second degree, punishable as provided in section 775.082, section 775.083, or section 775.084." (Emphasis supplied)
Fla. Stat. § 921.141, F.S.A., provides the procedure to be followed in determining what penalty should be assessed following a conviction for a crime designated as a capital felony. It provides:
"(1) Upon conviction or adjudication of guilt of a defendant of a capital felony the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by section 775.082. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If the trial jury has been waived or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury empaneled for *5 that purpose unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) and (7) of this section. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements; and further provided that this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Florida. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.
"(2) After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court based upon the following matters:
"(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (6), and
"(b) Whether sufficient mitigating circumstances exist as enumerated in subsection (7), which outweigh aggravating circumstances found to exist, and
"(c) Based on these considerations whether the defendant should be sentenced to life or death.
"(3) Notwithstanding the recommendation of a majority of the jury, the court after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
"(a) That sufficient aggravating circumstances exist as enumerated in subsection (6), and
"(b) That there are insufficient mitigating circumstances, as enumerated in subsection (7), to outweigh the aggravating circumstances. In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (6) and (7) and based upon the records of the trial and the sentencing proceedings.
"(4) If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with section 775.082.
"(5) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within sixty (60) days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed thirty (30) days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Supreme Court.
"(6) Aggravating circumstances.  Aggravating circumstances shall be limited to the following:
"(a) The capital felony was committed by a person under sentence of imprisonment;
"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person;
"(c) The defendant knowingly created a great risk of death to many persons;
"(d) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit any robbery, rape, arson, burglary, kidnaping, *6 aircraft piracy, or the unlawful throwing, placing or discharging of a destructive-device or bomb;
"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
"(f) The capital felony was committed for pecuniary gain;
"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws;
"(h) The capital felony was especially heinous, atrocious or cruel.
"(7) Mitigating circumstances.  Mitigating circumstances shall be the following:
"(a) The defendant has no significant history of prior criminal activity;
"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
"(c) The victim was a participant in the defendant's conduct or consented to the act;
"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
"(e) The defendant acted under extreme duress or under the substantial domination of another person;
"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
"(g) The age of the defendant at the time of the crime." (Emphasis supplied)
The Supreme Court of the United States in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and subsequent decisions struck down the previously existing death provisions of the several states with the possible exception "of a very few mandatory statutes" (See 408 U.S. 417, n. 2, 92 S.Ct. 2818), by holding:
"[T]he imposition and carrying out of the death penalty in [these cases] constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." (Emphasis supplied) (pp. 239-240, 92 S.Ct. p. 2727)
This is the only controlling law which Furman v. Georgia, supra, provides, as no more specific statement of the law could garner a majority of the members of the high court. It is not in the province of this Court to attempt to predict the future holdings of the Supreme Court of the United States and to attempt to weigh the laws of the State of Florida in light of the separate opinions of the five justices who constituted the majority in Furman v. Georgia, supra.
Two points can, however, be gleaned from a careful reading of the nine separate opinions constituting Furman v. Georgia, supra. First, the opinion does not abolish capital punishment, as only two justices  Mr. Justice Brennan and Mr. Justice Marshall  adopted that extreme position. The second point is a corollary to the first, and one easily drawn. The mere presence of discretion in the sentencing procedure cannot render the procedure violative of Furman v. Georgia, supra; it was, rather, the quality of discretion and the manner in which it was applied that dictated the rule of law which constitutes Furman v. Georgia, supra.
Discretion and judgment are essential to the judicial process, and are present at all stages of its progression  arrest, arraignment, trial, verdict, and onward through final appeal. Even after the final appeal is laid to rest, complete discretion remains in the executive branch of government to honor or reject a plea for clemency. See Fla. Const., art. IV, § 8, F.S.A., and U.S. Const., art. II, § 2.
*7 Thus, if the judicial discretion possible and necessary under Fla. Stat. § 921.141, F.S.A., can be shown to be reasonable and controlled, rather than capricious and discriminatory, the test of Furman v. Georgia, supra, has been met. What new test the Supreme Court of the United States might develop at a later date, it is not for this Court to suggest.
As will be discussed hereafter, we have determined that each of the questions certified by the three circuit courts involved in the case sub judice must be answered in the negative, and the circuit court in the case of State v. Dixon, case No. 43,521, must be reversed.
Capital punishment is not, per se, violative of the Constitution of the United States (Furman v. Georgia, supra) or of Florida. Wilson v. State, 225 So.2d 321 (Fla. 1969).
Death is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes. In so doing, the Legislature has also recognized the inability of man to predict the myriad tortuous paths which criminality can choose to follow. If such a prediction could be made, the Legislature could have merely programmed a judicial computer with all of the possible aggravating factors and all of the possible mitigating factors included  with ranges of possible impact of each  and provided for the imposition of death under certain circumstances, and for the imposition of a life sentence under other circumstances. However, such a computer could never be fully programmed for every possible situation, and computer justice is, therefore, an impossibility. The Legislature has, instead, provided a system whereby the possible aggravating and mitigating circumstances are defined, but where the weighing process is left to the carefully scrutinized judgment of jurors and judges.
It is necessary at the outset to bear in mind that all defendants who will face the issue of life imprisonment or death will already have been found guilty of a most serious crime, one which the Legislature has chosen to classify as capital. After his adjudication, this defendant is nevertheless provided with five steps between conviction and imposition of the death penalty  each step providing concrete safeguards beyond those of the trial system to protect him from death where a less harsh punishment might be sufficient.
First, the question of punishment is reserved for a post-conviction hearing so that the trial judge and jury can hear other information regarding the defendant and the crime of which he has been convicted before determining whether or not death will be required. Both the State and the defendant are allowed to present evidence at the hearing, evidence which might have been barred or withheld from a trial on the issue of guilt or innocence.
The discretion of the trial judge in determining what evidence might be relevant to the sentence is not unbridled. It is merely a necessary power to avoid a needlessly drawn out proceeding where one party might choose to go forward with evidence which bears no relevance to the issues being considered. It is easily determined from the broadness of the statute that a narrow interpretation of the rules of evidence is not to be enforced, whether in regards to relevance or to any other matter except illegally seized evidence.
Another advantage to the defendant in a post-conviction proceeding, is his right to appear and argue for mitigation. The State can cross-examine the defendant on those matters which the defendant has raised, to get to the truth of the alleged mitigating factors, but cannot go beyond them in an attempt to force the defendant to prove aggravating circumstances for the State. A defendant is protected from self-incrimination through the Constitutions of Florida and of the United States. Fla. *8 Const., art. I, § 9, F.S.A., and U.S.Const., Amend. V. In no event, is the defendant forced to testify. However, if he does, he is protected from cross-examination which seeks to go beyond the subject matter covered on his direct testimony and extend to matters concerning possible aggravating circumstances.
The second step of the sentencing procedure is that the jury  the trial jury if there was one, or a specially called jury if jury trial was waived  must hear the new evidence presented at the post-conviction hearing and make a recommendation as to penalty, that is, life or death. With the issue of guilt or innocence disposed of, the jury can then view the question of penalty as a separate and distinct issue. The fact that the defendant has committed the crime no longer determines automatically that he must die in the absence of a mercy recommendation. They must consider from the facts presented to them  facts in addition to those necessary to prove the commission of the crime  whether the crime was accompanied by aggravating circumstances sufficient to require death, or whether there were mitigating circumstances which require a lesser penalty.
The third step added to the process of prosecution for capital crimes is that the trial judge actually determines the sentence to be imposed  guided by, but not bound by, the findings of the jury. To a layman, no capital crime might appear to be less than heinous, but a trial judge with experience in the facts of criminality possesses the requisite knowledge to balance the facts of the case against the standard criminal activity which can only be developed by involvement with the trials of numerous defendants. Thus the inflamed emotions of jurors can no longer sentence a man to die; the sentence is viewed in the light of judicial experience.
The fourth step required by Fla. Stat. § 921.141, F.S.A., is that the trial judge justifies his sentence of death in writing, to provide the opportunity for meaningful review by this Court. Discrimination or capriciousness cannot stand where reason is required, and this is an important element added for the protection of the convicted defendant. Not only is the sentence then open to judicial review and correction, but the trial judge is required to view the issue of life or death within the framework of rules provided by the statute.
Review of a sentence of death by this Court, provided by Fla. Stat. § 921.141, F.S.A., is the final step within the State judicial system. Again, the sole purpose of the step is to provide the convicted defendant with one final hearing before death is imposed. Thus, it again presents evidence of legislative intent to extract the penalty of death for only the most aggravated, the most indefensible of crimes. Surely such a desire cannot create a violation of the Constitution.
We also consider it reasonable to require that a finding that life imprisonment be imposed rather than death should be supported in writing by the trial judge. This we do require under our constitutional power to regulate practice and procedure in the courts. Fla. Const., art. V, § 2(a), F.S.A.
Cases involving life imprisonment would not be directly reviewable by this Court, and the District Courts of Appeal would not be empowered to overturn the trial judge on the issue of sentence. However, requiring these findings by the judge provides an additional safeguard for the defendant sentenced to death in that it provides a standard for life imprisonment against which to measure the standard for death established in the defendant's case, and again avoids the possibility of discriminatory sentences of death.
The most important safeguard presented in Fla. Stat. § 921.141, F.S.A., is the propounding of aggravating and mitigating circumstances which must be determinative of the sentence imposed. It is argued that the circumstances are vaguely worded in some cases, and that they do not provide *9 meaningful restraints and guidelines for the discretion of judge and jury. We disagree.
The aggravating circumstances of Fla. Stat. § 921.141(6), F.S.A., actually define those crimes  when read in conjunction with Fla. Stat. §§ 782.04(1) and 794.01(1), F.S.A.  to which the death penalty is applicable in the absence of mitigating circumstances. As such, they must be proved beyond a reasonable doubt before being considered by judge or jury.
Considered in that vein, Fla. Stat. § 921.141(6), subsections (a) and (b), F.S.A., prescribe the death penalty for a capital felony committed by a prisoner or by one previously convicted of a capital felony. These conditions represent two situations wherein the death penalty has been determined by the Legislature to be applicable, absent overriding mitigating factors.
Likewise, Fla. Stat. § 921.141(6)(c), F.S.A., provides the death penalty for one who is convicted of a capital felony in which he knowingly created a great risk of death to many persons. The use of the adjectives "great" and "many" is attacked as vague, but we feel that a man of ordinary intelligence and knowledge easily conceives the concepts involved.
Fla. Stat. § 921.141(6)(d), F.S.A., provides that the commission of a capital felony as part of another dangerous and violent felony constitutes not only a capital felony under Fla. Stat. § 782.04(1), F.S.A., but also an aggravated capital felony. Such a determination is, in the opinion of this Court, reasonable.
Capital felonies committed with the motive of avoiding arrest, escape, monetary gain, or the disruption or hinderance of the lawful exercise of government or law enforcement have also been designated as aggravated capital felonies pursuant to Fla. Stat. § 921.141, F.S.A., subsections (e), (f) and (g), F.S.A., and we again feel that the definitions of the crimes intended to be included are reasonable and easily understood by the average man.
The aggravating circumstance which has been most frequently attacked is the provision that commission of an especially heinous, atrocious or cruel capital felony constitutes an aggravated capital felony. Fla. Stat. § 921.141(6)(h), F.S.A. Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
When one or more of the aggravating circumstances is found, death is presumed to be the proper sentence unless it or they are overridden by one or more of the mitigating circumstances provided in Fla. Stat. § 921.141(7), F.S.A. All evidence of mitigating circumstances may be considered by the judge or jury.
The first mitigating circumstance is that the defendant has no prior significant history of criminal activity. Fla. Stat. § 921.141(7)(a), F.S.A. As to what is significant criminal activity, an average man can easily look at a defendant's record, weigh traffic offenses on the one hand and armed robberies on the other, and determine which represents significant prior criminal activity. Also, the less criminal activity on the defendant's record, the more consideration should be afforded this mitigating circumstance.
*10 Extreme mental or emotional disturbance is a second mitigating consideration, pursuant to Fla. Stat. § 921.141(7)(b), F.S.A., which is easily interpreted as less than insanity but more than the emotions of an average man, however inflamed.
If the victim was a participant in or consented to the criminal conduct, or if the defendant was found guilty of a capital felony as an accomplice and did not play any major part in the capital felony, these factors are also to be considered. Fla. Stat. § 921.141(7), subsections (c) and (d), F.S.A.
While duress or domination by another person may not excuse a capital felony, the Legislature has determined that they should be considered in mitigation, not of the guilt of the defendant, but of the sentence. Fla. Stat. § 921.141(7)(e), F.S.A. Such a consideration appears to us to be reasonable, and another protection of the defendant who has at least some basis for seeking the mercy of society.
Mental disturbance which interferes with but does not obviate the defendant's knowledge of right and wrong may also be considered as a mitigating circumstance. Fla. Stat. § 921.141(7)(f), F.S.A. Like subsection (b), this circumstance is provided to protect that person who, while legally answerable for his actions, may be deserving of some mitigation of sentence because of his mental state.
Finally, the age of the defendant may be considered pursuant to Fla. Stat. § 921.141(7)(g), F.S.A. This allows the judge and jury to consider the effect that the inexperience of the defendant on the one hand or, in conjunction with subsection (a), the length of time that the defendant has obeyed the laws in determining whether or not one explosion of total criminality warrants the extinction of life.
Common law recognizes a presumption of the incapacity of an infant to commit a crime, and under the age of seven years, the presumption is conclusive. 43 C.J.S. Infants § 96(d)(1)(b); 6 F.L.P., Criminal Law, § 26. The possible effect of great age with its attendant weaknesses and infirmities has also been recognized as to the issue of competency, as the Ohio Court of Common Pleas held,
"[A]ge is an item of proof competent and worthy of being considered in an investigation to determine the question of competency." Corbit v. Corbit, 7 Dec. Repr. 692, p. 697, IV Wkly.Law Bull. 1006 (Ohio Coshocton C.P. 1879).
Thus, the Legislature has chosen to provide for consideration of the age of the defendant  whether youthful, middle aged, or aged  in mitigation of the commission of an aggravated capital crime. The meaning of the Legislature is not vague, and we cannot say that such a consideration is unreasonable per se. Any inappropriate application by a jury of the standard under the facts of a particular case may be corrected by the Court.
It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in Furman v. Georgia, supra, can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all.
*11 The Circuit Courts of Duval and Orange Counties have also certified questions involving the interpretation of Fla. Stat. § 782.04, F.S.A., insofar as it defines the crimes of murder in the first degree and murder in the second degree. As quoted above, Fla. Stat. § 782.04(2), F.S.A., provides that murder "committed in the perpetration of or in the attempt to perpetrate" any one of seven specified violent felonies is a murder of the second degree. A murder "committed by a person engaged in the perpetration of or in the attempt to perpetrate" any of the same violent felonies is a murder in the first degree. Fla. Stat. § 782.04(1)(a), F.S.A.
The trial judge in State v. Dixon held that the distinction between the two sections of the murder statute was illusory, and that one charged with one of the crimes could interchangeably be charged with the other at the whim of the grand jury. We disagree, and hold that the statute does establish two separate and easily distinguishable degrees of crime, depending upon the presence of the defendant as a principal in the first or second degree.
Under the prior Fla. Stat. § 782.04, F.S.A. (amended effective December 8, 1972), the distinction was not present, and Fla. Stat. § 776.011, F.S.A., provides,
"Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, is a principal in the first degree and may be charged, convicted and punished as such, whether he is or is not actually or constructively present at the commission of such offense."
The effect of this law was that the traditional definitions of principal in the first degree, principal in the second degree, and accessory before the fact were all combined within the statutory definition of principal in the first degree in Fla. Stat. § 776.011, F.S.A., and in the repealed Fla. Stat. § 782.04, F.S.A.
The obvious intention of the Legislature in making this change is to resurrect the distinction between principals in the first or second degree on the one hand and accessories before the fact on the other, in determining whether a party to a violent felony resulting in murder is chargeable with murder in the first degree or murder in the second degree. As to the distinction in any particular case, we need but refer to the rich heritage of case law on the distinctions between principals in the first or second degree and accessories before the fact.
Having reviewed the statutes under consideration, it is the opinion of this Court that Fla. Stat. §§ 775.082, 782.04 and 921.141, F.S.A., are constitutional as measured by the controlling law of this State and under the constitutional test provided by Furman v. Georgia, supra.
Accordingly, the certified questions of the Circuit Courts of Dade, Orange and Duval Counties are all answered in the negative, and the decision of the Circuit Court for Dade County in State v. Setser is reversed and the causes are all remanded for further proceedings not inconsistent herewith.
It is so ordered.
CARLTON, C.J., McCAIN and DEKLE, JJ., and WILLIS, Circuit Judge, concur.
ERVIN, J., dissents with opinion.
BOYD, J., dissents with opinion.
ERVIN, Justice (dissenting):
The United States Supreme Court, in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), in striking down as unconstitutional the death penalty statutes of Georgia and Texas, held that
"the imposition and carrying out of the death penalty in [these cases] constitute *12 cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments." (Supra at 239-240, 92 S.Ct. at 2727.)
This decision was a 5-4 decision, in which all nine Justices wrote separate opinions. Relying upon Furman, the Supreme Court in Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), unanimously agreed that
"the Court today has ruled that the imposition of the death penalty under statutes such as those of Illinois is violative of the Eighth and Fourteenth Amendments... ." (Supra, at 800, 92 S.Ct. at 2570.)
The Furman and Moore cases were followed by a series of about 120 unanimous per curiam opinions, in which the Supreme Court invalidated the unexecuted death sentences imposed under the state statutes of 26 states,[1] including Florida's death penalty statute.[2]
This Court has applied Furman and the cases which followed it by vacating all unexecuted death sentences which were imposed under the death penalty statute of Florida as it existed at the time of the Furman decision.[3]
Under Section 755.082(1), F.S. 1971, F.S.A., the death penalty in existence in Florida at the time of the Furman decision, any defendant found guilty of a capital felony[4] was sentenced to death unless there was a recommendation of mercy made by the jury in its verdict of guilty.[5] In those cases where the jury recommended mercy, the defendant was sentenced to life imprisonment. Pursuant to Section 4(2), Article V, Florida Constitution 1968, all cases in which the death penalty was imposed were subject to a direct appeal to this Court as a matter of right. This review, however, was limited to the question of guilt or innocence and not the question of punishment. In those cases where the defendant was not sentenced to *13 death but to life imprisonment, appellate review was available to the respective District Courts of Appeal.
As a result of the Furman line of cases, the Florida Legislature enacted the death penalty statute which is challenged in the cases before us, F.S. Section 921.141, F.S.A. Unlike the old death penalty statute, which gave the jury  or the judge where the defendant pleaded guilty or waived a jury trial  complete and unbridled discretion to decide whether death or life imprisonment would be imposed, the new death penalty statute attempts to limit that discretion in an effort to bring the statute within the requirements of Furman. The majority of this Court has held that the Legislature's attempt to re-establish the death penalty has been successful in meeting those requirements. I cannot agree.
Under the new death penalty statute, F.S. Section 921.141, F.S.A. the Legislature has provided for a bifurcated trial system. Under this system a person who is found guilty or pleads guilty to a capital felony[6] receives a second "trial" by the same judge and jury to determine whether the person should be sentenced to death or to life imprisonment. In those cases where the defendant pleads guilty or has waived a jury trial, the statute requires that the trial judge empanel a jury, unless also waived, for the purpose of determining the sentence to impose. Evidence presented at the sentencing hearing is admissible at the discretion of the trial judge.
The jury's function is to make a recommendation at the conclusion of the second hearing as to whether the defendant should be sentenced to death or to life imprisonment. The recommendation, however, is advisory only, in that the trial judge is not in any way bound by their recommendation. The trial judge, based upon his own evaluation of the evidence, makes the actual determination of what sentence to impose.
In those cases where the defendant is sentenced to death, the trial judge is required to set forth in writing his findings upon which the sentence is based. No similar requirement, however, is provided for in those cases where the trial judge imposes life imprisonment. If the death penalty is imposed, the decision is subject to review by this Court upon both the question of guilt or innocence and the question of the sentence. In those cases where life imprisonment is imposed, appellate review exists in the District Courts of Appeal.
Finally, the Legislature has provided a list of eight aggravating circumstances and seven mitigating circumstances which the jury and the trial judge are to consider in their determination of what sentence to impose.
While the total impact of the Furman decision is not known because of the nine separate opinions of the United States Supreme Court, one principle seems clear: the discretionary system under which the death penalty has been imposed by the several states is violative of the Eight and Fourteenth amendments. The questions of whether the death penalty is, per se, unconstitutional and whether all discretionary death penalty statutes are unconstitutional were not sufficiently answered by the U.S. Supreme Court. Nor do I find it necessary to reach those questions at this time. All that is necessary for this Court to decide is the question of whether or not the system provided for in F.S. Section 921.141, F.S.A. sufficiently eliminates the discretion which the U.S. Supreme Court in Furman condemned. It is significant to note, however, that several authorities have interpreted Furman to hold that no death penalty statute which contains any discretion whatsoever is constitutional. Thus, the Attorney General of Florida in a memorandum dated July 7, 1972, analyzed Furman and concluded
"it is my view that the United States Supreme Court's decision has not impaired *14 and does not prevent the enactment of legislation calling for the death penalty so long as said legislation is mandatory in its terms. Such legislation would present an entirely different legal question that that disposed of by the Court.[7] (Emphasis supplied.)
Also, two Assistant Attorneys General, Mr. Georgieff and Mr. Markey, testifying before the House Select Committee on the Death Penalty on November 27, 1972, stated that any effort to reinstate the death penalty on a discretionary basis would be unconstitutional under Furman.[8] The legal advisory staff of the Governor's Committee to Study Capital Punishment, on October 20, 1972, reached a similar conclusion.[9] Finally, the Maryland Court of Appeals, in Batholomey v. State, 267 Md. 175, 297 A.2d 696 (1972), states:
"we entertain not the slightest doubt that the imposition of the death sentence under any of the presently existing discretionary statutes of Maryland which authorize, but do not require, that penalty is unconstitutional under Furman as violative of the Eighth and Fourteenth Amendments to the federal constitution. In other words, we think the net result of the holding in Furman is that the death penalty is unconstitutional when its imposition is not mandatory." (297 A.2d at 701; footnotes omitted.)
Without deciding whether any one element of discretion in this statute is violative of the Eighth and Fourteenth amendments, I conclude that the cumulative effect of this statute is to allow essentially the same excessive discretionary system which the U.S. Supreme Court would not allow in the Furman line of cases.
Turning to the statute itself, the majority finds the addition of a bifurcated trial system to be one of five steps between conviction and the imposition of the death penalty which provide adequate safeguards to protect a convicted defendant from the imposition of the death penalty where a less harsh punishment might be sufficient. The majority, however, fails to recognize that similar bifurcated trial systems were provided for in statutes held unconstitutional as a result of Furman. Bifurcated trials were provided for by the laws of California,[10] Connecticut,[11] Georgia,[12] New York,[13] Pennsylvania,[14] and Texas.[15] Of greater significance is the fact that at the penalty proceeding evidence upon any matter the trial judge deems "relevant" to the sentencing decision and of "probative value" may be admitted.[16] This, of course, constitutes a part of the discretion still remaining in the statute  which the majority recognizes.
The statute also provides for the weighing of evidence, in addition to that admitted into the trial on the question of guilt *15 or innocence, by the jury, upon which a recommendation as to what sentence is to be imposed is based; the majority's second step. Following this recommendation, the statute provides that the trial judge make the actual determination of the sentence to be imposed; the majority's third step.
Like the provision for a bifurcated trial system, some of the cases in which the United States Supreme Court reversed the imposition of the death penalty involved states whose laws provided the trial judge with the power to override a jury recommendation of life imprisonment or death.[17]
More importantly, too much discretion still remains in the jury in deciding what recommendation to make and in the trial judge in deciding what sentence to impose. The only attempt to eliminate that discretion is the addition of the lists of aggravating and mitigating circumstances. In making their decisions, both the trial judge and the jury are required to base their decisions upon
"(a) Whether sufficient aggravating circumstances exist ... and
"(b) Whether sufficient mitigating circumstances exist ... which outweigh aggravating circumstances found to exist ..." (Emphasis supplied.)[18]
According to the majority, the existence of the aggravating and mitigating circumstances is the "most important safeguard presented in Fla. Stat. § 921.141... ." The majority, however, fail to recognize that weighing of aggravating and mitigating circumstances, or some similar provision, was required by several of the states, either by statute or case law, whose death penalty statutes were found to be unconstitutional as a result of Furman. Some of the circumstances considered were also similar to those provided in the Florida death penalty statute.
For example, Connecticut law provided for a separate hearing upon the question of sentence at which time "evidence may be presented ... including but not limited to the nature and circumstances of the crime, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty."[19]
Illinois law provided that a defendant "was entitled to have his punishment determined upon evidence limited to the facts and circumstances of that crime,"[20] and it was "the duty of the jury to fix the penalty from a consideration of all the circumstances, including the heinousness, atrocity, and cruelty of the crime... ."[21]
In People v. Grews, 42 Ill.2d 60, 244 N.E.2d 593 (1969), the Illinois Court reversed the imposition of the death penalty based upon the fact that the defendant had no prior criminal record, was well regarded by friends, and was acting under the influence *16 of drugs. In People v. Walcher, 42 Ill.2d 159, 246 N.E.2d 256 (1969), the imposition of the death penalty was reversed because the defendant was an alcoholic.
Juries in Nebraska, in making their decisions as to whether defendants should be sentenced to death "had no right to be actuated by considerations of mercy but should be guided alone by the evidence, the facts, and the circumstances disclosed by the record... ."[22] In State v. Hall, 176 Neb. 295, 125 N.W.2d 918 (1964), a sentence of death was reversed because the defendant was young, feeble-minded and had no previous criminal record.
In Oklahoma, imposition of the death penalty has been reversed because the defendant's participation in felony murder was that of a minor accomplice;[23] because the defendant was intoxicated at the time, had no criminal record, and had a limited education;[24] and on the grounds that the defendant did not have a bad record after return from the army, and the victim was engaged in illegal activity when killed.[25]
In Pennsylvania, the imposition of the death penalty has been reversed where the defendant was young and of low intelligence;[26] where the defendant was devoted to his mother, had a good reputation, and was in a desperate financial situation and was poorly educated,[27] and where the defendant was of good character, without criminal record and there was provocation present.[28]
New Jersey law required that when life imprisonment was recommended the recommendation had to be made "upon and after the consideration of all the evidence.[29] This evidence included evidence relative to the background and the mental and emotional abilities and disabilities of defendants.[30]
Under Ohio law, a decision to recommend mercy had to be based upon "the facts and circumstances described by the evidence."[31]
Finally, under Tennessee law, the penalty for murder was death but it was provided that "the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at ..." from twenty years to life imprisonment.[32]
The difficulty with such general provisions was recognized in McGautha v. California, 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). In McGautha, Mr. Justice Harlan, speaking for the majority, states:
"It is apparent that such criteria do not purport to provide more than the most minimal control over the sentencing authority's exercise of discretion. They do not purport to give an exhaustive list of the relevant considerations or the way in which they may be affected by the presence or absence of other circumstances. They do not even undertake to exclude constitutionally impermissible considerations. And, of course, they provide no protection against the jury determined to decide on whimsy or caprice. In short, they do no more than suggest some subjects for the jury to consider during its *17 deliberations, and they bear witness to the intractable nature of the problem of `standards' which the history of capital punishment has from the beginning reflected."[33]
Under the Florida death penalty statute the lists of aggravating and mitigating circumstances are provided as the only circumstances which the trial judge and the jury are to consider in making their decisions. The limited nature of the lists provided by the Legislature was, however, also criticized by the U.S. Supreme Court in McGautha. On this point, Mr. Justice Harlan states that
"for a court to attempt to catalog the appropriate factors in this elusive area could inhibit rather than expand the scope of consideration, for no list of circumstances would ever be really complete. The infinite variety of cases and facets to each case would make general standards either meaningless `boilerplate' or a statement of the obvious that no jury would need.[34]
Mr. Chief Justice Burger in his dissenting opinion in Furman further points out that
"all past efforts `to identify before the fact' the cases in which the penalty is to be imposed have been `uniformly unsuccessful'... . One problem is that `the factors which determine whether the sentence of death is the appropriate penalty in particular cases are too complex to be compressed within the limits of a simple formula ...' Report of the Royal Commission on Capital Punishment, 1949-1953, Cmd. 8932, ¶ 498 [p. 174] (1953). As the Court stated in McGautha, `[t]he infinite variety of cases and facets to each case would make general standards either meaningless "boiler-plate" or a statement of the obvious that no jury would need.' 402 U.S., at 208, 91 S.Ct., at 1468 [, 28 L.Ed.2d at 727]... . Thus, unless the Court in McGautha misjudged the experience of history, there is little reason to believe that sentencing standards in any form will substantially alter the discretionary character of the prevailing system of sentencing in capital cases."[35]
Thus, by limiting the circumstances which the trial judge and the jury must consider, a new problem arises: the impossibility of listing all of the aggravating and mitigating circumstances which should be considered in deciding whether or not to impose the death penalty.
Additionally, the determination of what constitutes sufficient aggravating circumstances or sufficient mitigating circumstances and which set of sufficient circumstances outweighs the other is left to the sole discretion of jury, trial judge, and appellate reviewer. Other than the requirement that the circumstances be sufficient, no guidelines are provided by the statute. Thus both the trial judge and the jury are left with the discretion to determine what weight is to be given to each individual aggravating and mitigating circumstance. The presence or absence of any such circumstance or combination thereof does not compel any particular result. Whether a particular aggravating circumstance or circumstances will outweigh a particular mitigating circumstance or circumstances is solely within the discretion of the trial judge and jury. Additionally, the statute does not provide what burden of proof is required; beyond a reasonable doubt or some other test.
Another problem exists which compounds the excessive discretion which exists in deciding what weight is to be given the aggravating and mitigating circumstances: the exercise of discretion necessary *18 in interpreting these vague and overbroad circumstances.
Defendants "under sentence of imprisonment"[36] include all persons charged with crimes, whether a violent crime or not, as well as all degrees of crimes which might be considered violent. In determining whether a convicted capital felon has "knowingly created a great risk of death to many persons"[37] discretion is allowed, in fact required, to determine what constitutes "great risk" and what constitutes "many persons." The most difficult aggravating circumstance to justify is where the crime is found to be "especially heinous, atrocious or cruel."[38] Even the majority unintentionally recognize the vagueness of this provision by their statement that "to a layman, no capital crime might appear to be less than heinous... ."
The mitigating circumstances require the same degree of discretion in interpreting them. What constitutes "no significant history of prior criminal activity"?[39] What interpretation is to be given to "the influence of extreme mental or emotional disturbance"?[40] Also included are tests such as "capacity ... substantially impaired";[41] the influence of "extreme duress or ... substantial domination of another";[42] participation as "an accomplice ... relatively minor,"[43] and the "age of the defendant."[44]
Virtually all of the aggravating and mitigating circumstances thus require in themselves the application of judicial discretion in interpreting these circumstances in each individual case. Although the trial judge makes the actual determination of the sentence to impose, he must exercise the same degree of discretion as the jury. The fact that both judge and jury make a determination is of little consequence, for the statute in no way provides what weight, if any, the trial judge must give to the jury's recommendation.
The majority's fourth step  the requirement that the trial judge justify a sentence of death in writing  and the majority's fifth step  appellate review  do not sufficiently eliminate the excessive discretion required by the statute.
Appellate review of the issue of punishment was provided for by several statutes which were found to be unconstitutional as a result of Furman.[45] Additionally, the statute does not provide any guides for this Court as to our function upon review. For instance, what weight, if any, is this Court to give to a jury recommendation where the trial judge has not followed that recommendation?
The statute also fails to require either written findings or immediate review by this Court where life imprisonment, rather than the death penalty, is imposed by the trial judge. Thus "no meaningful basis for distinguishing the few cases in which it [the death penalty] is imposed from the many cases in which it is not,"[46] is provided for.
*19 Finally, in addition to the discretion required by F.S. Section 921.141, F.S.A., there exists in our judicial system a degree of discretion at every stage of a criminal proceeding. Mr. Chief Justice Burger recognizes at least one aspect of our judicial system in which the possibility of the exercise of excessive discretion exists when he states,
"there is no assurance that sentencing patterns will change so long as juries are possessed of the power to determine the sentence or to bring in a verdict of guilt on a charge carrying a lesser sentence; juries have not been inhibited in the exercise of these powers in the past."[47]
Although not in itself determinative of this case, this discretion adds to that discretion required in the application of the new death penalty statute. The majority recognizes this fact by its statement that
"discretion and judgment are essential to the judicial process, and are present at all stages of its progression  arrest, arraignment, trial, verdict, and onward through final appeal. Even after the final appeal is laid to rest, complete discretion remains in the executive branch of government to honor or reject a plea for clemency."
Some of the areas where discretion must be exercised include: (1) the inevitable discretion in making factual determinations; (2) the decision of the grand jury; (3) the decision of the prosecutor to bring charges, what charges to bring, and what penalty to ask for; (4) the jury's decision to convict of a lesser included offense; and (5) executive clemency.
In addition to the concern over the existence of excessive discretion, the United States Supreme Court was bothered by the manner in which the death penalty had been applied. Mr. Justice Stewart stated:
"These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. My concurring Brothers have demonstrated that, if any basis can be discerned for the selection of these few to be sentenced to die, it is the constitutionally impermissible basis of race."[48]
Mr. Justice Marshall states:
"Regarding discrimination, it has been said that `[i]t is usually the poor, the illiterate, the underprivileged, the member of the minority group  the man who, because he is without means, and is defended by a court appointed attorney  who becomes society's sacrificial lamb... .' Indeed, a look at the bare statistics regarding executions is enough to betray much of the discrimination... . It is immediately apparent that Negroes were executed far more often than Whites in proportion to their percentage of the population... .
"There is also overwhelming evidence that the death penalty is employed against men and not women... .
"It also is evident that the burden of capital punishment falls upon the poor, the ignorant, and the underprivileged members of society."[49]
Mr. Justice Stewart concludes that it has not been proved that the few defendants *20 who have been sentenced to die have been selected on the basis of race and thus fails to reach the question of whether the application of the death penalty constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment.
The comments quoted above raise, generally, a second issue which I feel compelled to discuss: Whether the classification selected by the Legislature of Florida of those individuals subject to capital punishment denies to any person within the State of Florida the equal protection of the laws. In discussing this issue, it is necessary to first decide what test is to be applied in determining whether the equal protection's prohibition against unreasonable classifications has been violated.
That laws are all to some degree or another based upon some form of classification is clear. Such classifications are not per se violative of equal protection. But it is also clear that any disparity in treatment of individuals caused by such a classification must be at least reasonable.[50] Traditionally, the test of whether a classification is reasonable includes a determination of whether the classification is in itself a rational one, i.e., based upon social, economic, historical or geographic sectors, whether the classification and the legislative purpose are reasonably related, and whether all those included in the classification are treated equally  in light of the above-quoted portions of Furman it is doubtful whether the death penalty statutes which were struck down by Furman could meet this latter portion of the reasonableness test.
A stricter requirement has been employed where a classification is based upon a "suspect criteria" or where the classification restricts a "fundamental right." In cases involving such classifications, in addition to requiring that the traditional test of reasonableness be met, the states have been required to prove that a "compelling state interest" is served by the classification.
In my opinion, the selection of capital felons as a class upon whom the death penalty may be imposed clearly involves the "fundamental rights" of citizens of this state and is thus a suspect classification for which a compelling state interest must be shown. Additionally, as Mr. Justice Stewart and Mr. Justice Marshall recognize, the classification may be based, at least in its practical effects, upon race, thus requiring the application of the same test. Because this has not been proved, however, I do not feel it appropriate to hold that the application vel non of Florida's death penalty statute is (or will be) applied on the basis of race. That fundamental rights are involved, however, seems clear and each case where the death penalty has been imposed must be judicially tested to determine if an invidious racial element entered into the imposition.
Mr. Justice Brennan, in concluding that the death penalty is per se unconstitutional, recognizes what can hardly be denied  that the imposition of death deprives a human being of all rights. In discussing the question of whether death is uniquely degrading to human dignity, Mr. Justice Brennan states as follows:
"Death is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. The contrast with the plight of a person punished by imprisonment is evident. An individual in prison does not lose `the right to have rights.' A prisoner retains, for example, the constitutional rights to the free exercise of religion, to be free of cruel and unusual punishments, and to treatment as a `person' for purposes of due process of law and the equal protection of the laws. A prisoner remains a member of the human family. Moreover, he retains the right *21 of access to the courts. His punishment is not irrevocable... . An executed person has indeed `lost the right to have rights.'"[51]
It is abundantly clear that the imposition of death deprives all persons subjected to such a punishment of all fundamental rights. It also, and possibly of greater significance, deprives those punished by death of life itself.
Turning to the reasoning behind death penalty statutes, Mr. Justice Marshall concludes that there are six purposes conceivably served by capital punishment:
"retribution, deterrence, prevention of repetitive criminal acts, encouragement of guilty pleas and confessions, eugenics, and economy.[52]
While traditionally these purposes have been accepted as justifying the imposition of the death penalty, nevertheless in the light of these sober and thought-provoking reflections of members of the nation's highest court, I can no longer blindly accept their accuracy. As Mr. Justice Brennan points out,
"the outstanding characteristic of our present practice of punishing criminals by death is the infrequency with which we resort to it. The evidence is conclusive that death is not the ordinary punishment for any crime."[53]
Mr. Justice Stewart states,
"it is equally clear that these sentences are `unusual' in the sense that the penalty of death is infrequently imposed for murder, and that its imposition for rape is extraordinarily rare."[54]
Mr. Justice White concludes that
"the death penalty could so seldom be imposed that it would cease to be a credible deterrent or measurably to contribute to any other end of punishment in the criminal justice system."[55]
Because of the infrequent use of the death penalty, it would seem reasonable, in fact mandatory, that the Florida Legislature reconsider the purposes which have traditionally been assumed to justify so harsh a penalty as death. The Legislature, in re-enacting a death penalty statute, placed its emphasis on merely meeting the requirements of Furman. What the Legislature failed to do was to determine whether or not the purposes which have traditionally been assumed to support the imposition of the death penalty remain viable today. Florida's history alone of refusing for the past several years to impose the death penalty should not have been lightly disregarded by the Legislature.
Mr. Justice Marshall has concluded that the traditional purposes of the death penalty do not retain their validity. I am not able at this time to reach the same conclusion, for neither the Legislature in enacting this statute nor the Florida Attorney General in arguing the case, have addressed themselves to this point. It is my conclusion, however, that the State has failed to present sufficient proof upon which it may be concluded that the death penalty is supported by any compelling state interest.
Florida's citizens should not be subjected to a state law imposing the death penalty of greater degree and kind than that which *22 may be constitutionally imposed upon other citizens of the nation. Life is such a supremely precious privileged right to have, enjoy and exercise that the Constitution of the United States protects it equally for all the nation's citizens from state governmental deprivations of different kinds and degrees.
Unless Florida's death penalty statute can meet national standards it must fall because of sheer inequality. One state can not have a greater compelling interest in imposing the death penalty than another; nor can its death penalty statute differ in constitutional substance from that of another state.
It is our duty as judges sworn to uphold the nation's constitution to apply national constitutional standards with clinical objectivity in this matter, without catering to popular clamor or the vagaries of provincialism, local pressures, emotion or passion.
Quite candidly and with respect, our Florida Legislature appears from its statutory product to have impulsively and emotionally due to public clamor strayed from the national standards set forth in the plural-opinion decision of the United States Supreme Court in Furman. Sober reflection should have its second inning in our State Legislature.
It is my hope that there may be a second inning and, if so, that the Legislature will reconsider this profound subject less precipitately and passionately than it did  less under the influence of archaic and atavistic impulses and the whip of public furor stirred by national and local political opportunism. The grave problem of whether the death penalty should be imposed ought not to be a vehicle for political capital or to serve as an extraneous scapegoat to illogically appease our society's sense of guilt, fear, passion, and vengeance. All of us have feet of clay, none of us has allknowing impeccable judgment; none of us can be exemplars of "holier than thou" in this matter of governmentally prescribing life or death for other citizens. The greatest care to follow national standards should be taken by the Legislature in making a collective judgment regarding capital punishment.
In our pecuniary culture the rage to emulate status by invidious comparison on bases of wealth or one's cunning ability to get more and spend more than his neighbors, causes us to constantly downgrade or become callous to the value of humanitarian principles.
The death penalty, to conventional nonthinkers despite conclusions to the contrary of the Supreme Court of the United States, is a protective deterrent essential to class status because capital felonies are often committed by the "have nots" and the economically inferior. They overlook that the hallmark of a civilized progressive people is their appreciation that infliction of cruel and unusual punishment disproportionately upon the underprivileged and the mentally incompetent is the antithesis of a fair and humane society and can be one of the elements leading to anarchy and revolution. Because of pecuniary myopia, we often narrow our horizons of compassion and insularly lack reverence for life.
Because of our overdrawn servility to the concepts of economic status and our personal standings in those respects, we are inclined to be callous to the virtues of compassion and refuse to take slower paces for the correction of human ills through education and rehabilitation. These more enlightened alternatives are not harsh or speedy enough to suit our atavistic sense of vengeance or our passions, or to calm our imagined fears of threats to our pecuniary society or to abate our belief that extreme deterrents are necessary.
We often avoid the psychological and scientific methods of coping with society's ills  the slower, painstaking rehabilitative measures requisite to the evolution of a peaceful, enlightened society. We seek emotional shortcuts to assuage our fears. Like vigilantes, our humanity and sense of ultimate values are weak. Our Legislature *23 should have opportunity again to take these enlightened alternatives more into account in faithfully complying with national standards.
Despite the terror and horribleness of heinous homicidal crime, each instance of which outrages our sensibilities, the need for mature intelligence and understanding in devising therefor the State's corrective and rehabilitative processes is nevertheless mandatory in the light of the pronouncements of the Supreme Court of the United States.
The nation's highest court recognizes we have come a long way from the rack, the "drawing and quartering," the headsman's axe, the public executions, the "hanging judge"  from cruel and unusual punishments. We can little afford to turn back because it is clear to thinking people that brutality and cruelty at the hands of government soils the fabric of an enlightened nation. Governments are constantly under scrutiny  constantly gauged by a nation's thinking people in terms of whether they are enlightened and humane; of whether they are still instruments of oppression, perpetuators of archaic punishments to allay the fears and passions of privileged groups.
Sir Winston Churchill wisely said in the House of Commons in 1910:
"The word and temper of the public in regard to the treatment of crime and criminals is one of the most unfailing tests of any country.
"A calm, dispassionate recognition of the rights of the accused, and even of the convicted criminal, against the state; a constant heart-searching by all charged with the duty of punishment; a desire and eagerness to rehabilitate in the world of industry those who have paid their due in the hard coinage of punishment, tireless efforts toward the discovery of curative and regenerative processes; unfailing faith that there is a treasure if you can only find it, in the heart of every man  these are the symbols which in the treatment of crime and criminal mark and measure the shored up strength of a nation, and are sign and proof of the living virtue within it."
It is therefore my conclusion that Section 921.141, Florida Statutes, F.S.A., is unconstitutional because: (1) the statute does not sufficiently eliminate the discretion in imposing the death penalty which Furman condemns; (2) the State has failed to consider or present sufficient proof upon which it may be concluded that the death penalty for a citizen of the United States is justified by a compelling state interest; (3) Florida must comply with national standards as enunciated by the Supreme Court of the United States in imposing a state death penalty; (4) Florida should not apply a death penalty of greater degree and kind to its citizens than do other states  perhaps Florida should await action of the Congress in prescribing the death penalty, if any, according to national standards enunciated by the United States Supreme Court because of the Federal citizenship of the nation's citizens, including Floridians.
BOYD, Justice (dissenting).
I respectfully dissent.
The Supremacy Clause of the Constitution of the United States provides that document is the Supreme Law of the Land.[1] Upon the State courts, equally with the courts of the Federal system, rests the obligation to guard, enforce, and protect every right granted or secured by *24 the Constitution of the United States, whenever those rights are involved in any suit or proceedings before them.[2] Consequently, it is the duty of State Supreme Courts to follow the guidelines announced by the Supreme Court of the United States in construing Federal Constitutional rights.
From the time Florida became a part of the United States of America, up until 1972, capital punishment had been held to be constitutional by both the courts of the United States and of the State of Florida. However, in Furman v. Georgia,[3] and several companion decisions, a majority of the Supreme Court of the United States held capital punishment, as it had been administered in this country, to be unconstitutional. While four members of the Court held the capital punishment laws constitutional, two members clearly indicated that they felt all forms of capital punishment laws violated the Eighth and Fourteenth Amendments to the Constitution of the United States, and the remaining three members of the Court ruled against any capital punishment in which the court or jury had discretion in fixing sentences, as had been the case in most states up to that time.
Although it seems impossible to arrive at any central theme of the Court, nevertheless, by reading the nine separate opinions contained in Furman, it seems probable that at least one of those rejecting capital punishment in that decision might well join the four dissenters and form a majority approving capital punishment if the exercise of discretion by judges and juries should be eliminated, since, in Furman, several of the "majority" justices indicated that the only acceptable basis for capital punishment would be a system under which all persons found guilty of certain crimes would be executed without regard to "mitigating" or "aggravating" circumstances.
Assuming, arguendo, that the Supreme Court of the United States might approve a capital punishment statute under which no discretion would be exercised, let us now weigh Florida's new capital punishment statute against that concept to see whether said statute meets Federal Constitutional standards.
Under the prior law,[4] when a trial jury found a person guilty of a capital felony, a majority of the twelve member jury could mandate a life sentence for the defendant, instead of death, by recommending him to the mercy of the court. The judge would then be compelled by statute to impose a life sentence. Alternatively, if no such recommendation was given, the judge was similarly compelled to impose a death sentence. It was this type of discretion exercised by juries under the prior law which was so strongly condemned by the Court in Furman.
*25 The new law[5] provides, generally, for a jury first to determine guilt or innocence, and then for that same jury to consider circumstances, relating both to the defendant *26 and the crime, upon which to base a recommendation for the imposition of death or a life sentence. Regardless of the jury's recommendation, however, the judge may, in his discretion, impose a sentence of death or life. In point of fact, a death sentence could be imposed although the entire twelve member jury had recommended a life sentence. Likewise, the judge could impose a life sentence although the entire jury had recommended death.
Under the old system, a majority of the twelve member jury, in the exercise of their discretion, determined the nature of the punishment. Under the new law, to the exercise of that discretion is added the opportunity for the arbitrary, completely unfettered, and final exercise of discretion by the judge. Clearly, the new law provides for even more discretion than the quantum thereof condemned in Furman.
With the same objectivity as a merchant measuring cloth, I have compared the new Florida capital punishment statute with Federal Constitutional standards, and find said law to be unconstitutional.
Additionally, the statute is inherently defective in that the distinctions between first and second degree murder are so ambiguous as to make it impossible for grand juries, petit juries, and judges to distinguish the difference.[6] As written, the effect of these statutory provisions is that one who illegally causes the death of another while committing certain other felonies *27 may be guilty of first degree murder, while, in another trial, one who causes death to another under exactly the same circumstances may be guilty of second degree murder.
I am aware of the strong political, social, economic, religious, and philosophical views on capital punishment held by the public. These are proper matters for the Legislature to consider in the enactment of criminal statutes. When laws are constitutional, the courts should interpret them and should not legislate. My personal views on capital punishment must be subordinate to my sworn duty to follow and interpret the written law. As a Justice of this Court, I have, in the past, carefully followed prior Federal Constitutional guidelines by affirming approximately thirty death sentences, and upholding Florida's old capital punishment statute. I now must determine that Florida's current capital punishment statute is inadequate to meet the requirements of the Supreme Court of the United States, and I, therefore, must dissent.
NOTES
[1] See Stewart v. Massachusetts, 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972), and companion cases.
[2] § 775.082(1), F.S. 1971. Sentences imposed under Florida's death penalty statute were reversed in Anderson v. Florida, 408 U.S. 938, 92 S.Ct. 2868, 33 L.Ed.2d 758 (1972); Thomas v. Florida, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 750 (1972); Johnson v. Florida, 408 U.S. 939, 92 S.Ct. 2875, 33 L.Ed.2d 762 (1972); Boykin v. Florida, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972); Brown v. Florida, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972); Paramore v. Florida, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972); Pitts v. Wainwright, 408 U.S. 941, 92 S.Ct. 2856, 33 L.Ed.2d 765 (1972), and Williams v. Wainwright, 408 U.S. 941, 92 S.Ct. 2864, 33 L.Ed.2d 765 (1972).
[3] E.g., Anderson v. State, 267 So.2d 8 (Fla. 1972); In re Baker, 267 So.2d 331 (Fla. 1972); Donaldson v. Sack, 265 So.2d 499 (Fla. 1972).
[4] All felonies were classified as either capital or first, second, or third degree felonies. § 775.081(1), F.S. 1971 F.S.A. Capital felonies included: premeditated murder, § 782.04(1), F.S. 1971 F.S.A. felony murders, i.e., murders committed in the perpetration of or in the attempt to perpetrate arson, burglary, rape, robbery, abominable and detestable crime against nature, or kidnapping, § 782.041 (1), F.S. 1971 F.S.A.; bombing or machine-gunning in public places, § 790.16, F.S. 1971 F.S.A.; homicide caused by a destructive device, § 790.161(1), F.S. 1971 F.S.A.; rape of a female of the age of ten years or more, § 794.01, F.S. 1971, F.S.A., carnal knowledge and abuse of a female child under the age of ten years, § 794.01, F.S. 1971, F.S.A., and kidnapping for ransom, § 805.02, F.S. 1971, F.S.A.
[5] § 775.082(1), F.S. 1971, F.S.A., provided:

"[a] person who has been convicted of a capital felony shall be punished by death unless the verdict includes a recommendation to [sic] mercy by a majority of the jury, in which case the punishment shall be life imprisonment. A defendant found guilty by the court of a capital felony on a plea of guilty or when a jury is waived shall be sentenced to death or life imprisonment, in the discretion of the court."
[6] Capital felonies are now defined by F.S. § 782.04, F.S.A.
[7] Memorandum, Attorney General of Florida 7 (July 7, 1972).
[8] Hearings, House Select Committee on the Death Penalty, November 27, 1972.
[9] Memorandum, Legal Advisory Staff, Governor's Committee to Study Capital Punishment 9 (October 20, 1972).
[10] Cal.Penal Code § 190.1 (1970).
[11] Conn. Gen. Stat.Rev. § 53a-46 (Supp. 1969).
[12] Act of March 27, 1970, No. 1333, Ga. Laws 1970, p. 949.
[13] N.Y.Penal Law, McKinney's Consol. Laws, c. 40, § 125.30 (Supp. 1970-71), § 125.35 (1967).
[14] Pa. Stat. Ann., Tit. 18, § 4701 (1963).
[15] Tex. Code Crim. Proc., Art. 37.07(2)(b) (Supp. 1970-1971).
[16] New York law provided in similar manner that

"evidence may be presented by either party on any matter relevant to sentence... . Any relevant evidence, not legally privileged, shall be received regardless of its admissibility under the exclusionary rules of evidence." N.Y.Penal Law § 125.35(3) (1967).
[17] In the following cases the jury could make a binding recommendation of mercy, but a recommendation of death could be overridden by the trial judge: Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); Hurst v. Illinois, 408 U.S. 935, 92 S.Ct. 2854, 33 L.Ed.2d 749 (1972); Arrington v. Maryland, 408 U.S. 938, 92 S.Ct. 2869, 33 L.Ed.2d 759 (1972); Bartholomey v. Maryland, 408 U.S. 938, 92 S.Ct. 2870, 33 L.Ed.2d 759 (1972); Strong v. Maryland, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972), and Tull v. Warden, 408 U.S. 939, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972).

In the following cases the jury was authorized to make a binding recommendation of death, but a recommendation of mercy could be overridden by the trial judge: Kelbach v. Utah, 408 U.S. 935, 92 S.Ct. 2858, 33 L.Ed.2d 751 (1972); Seeney v. Delaware, 408 U.S. 939, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), and Steigler v. Delaware, 408 U.S. 939, 92 S.Ct. 2872, 33 L.Ed.2d 760 (1972).
[18] § 921.141(2)(a), (b), F.S.A. Also see § 921.141(3), F.S.A.
[19] Conn. Gen. Stat.Rev. § 53a-46(a) (Supp. 1969.
[20] People v. Black, 367 Ill. 209, 10 N.E.2d 801, 804 (1937).
[21] People v. Sullivan, 345 Ill. 87, 177 N.E. 733, 736 (1931).
[22] Sundahl v. State, 154 Neb. 550, 48 N.W.2d 689, 704 (1951).
[23] Lewis v. State, 451 P.2d 399 (Okl.Cr. App. 1968).
[24] Williams v. State, 89 Okla. Cr. 95, 205 P.2d 524 (1949).
[25] Waters v. State, 87 Okla. Cr. 236, 197 P.2d 299 (1948).
[26] Commonwealth v. Green, 396 Pa. 137, 151 A.2d 241 (1959).
[27] Commonwealth v. Irelan, 341 Pa. 43, 17 A.2d 897 (1941).
[28] Commonwealth v. Garramone, 307 Pa. 507, 161 A. 733 (1932).
[29] N.J. Stat. Ann., § 2A:113-4 (1969).
[30] State v. Reynolds, 41 N.J. 163, 195 A.2d 449 (1963).
[31] State v. Tudor, 154 Ohio St. 249, 95 N.E.2d 385, 390 (1950).
[32] Tenn. Code Ann., § 39-2406 (1955).
[33] McGautha v. California, 402 U.S. 183, 207, 91 S.Ct. 1454, 1467, 28 L.Ed.2d 711, 726 (1971).
[34] Id. 408 U.S. at 208, 91 S.Ct. at 1467-1468, 28 L.Ed.2d at 727.
[35] Furman v. Georgia, 408 U.S. 238, 401, 92 S.Ct. 2726, 2809-2810, 33 L.Ed.2d 346, 442-443 (1972) (Burger, C.J., dissenting.)
[36] § 921.141(6)(a), F.S.A.
[37] § 921.141(6)(c), F.S.A.
[38] § 921.141(6)(h), F.S.A.
[39] § 921.141(7)(a), F.S.A.
[40] § 921.141(7)(b), F.S.A.
[41] § 921.141(7)(f), F.S.A.
[42] § 921.141(7)(e), F.S.A.
[43] § 921.141(7)(d), F.S.A.
[44] § 921.141(7)(g), F.S.A.
[45] The United States Supreme Court reversed death sentences in several states in which the state appellate courts had exercised their powers to review a sentence of death. See, e.g., Alford v. Eyman, 408 U.S. 939, 92 S.Ct. 2874, 33 L.Ed.2d 762 (1972), which reversed State v. Alford, 98 Ariz. 124, 402 P.2d 551 (1965).
[46] Furman v. Georgia, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346, 392 (1972) (White, J., concurring).
[47] Id., 408 U.S. at 401, 92 S.Ct. at 2810. 33 L.Ed.2d at 443 (Burger, C.J., dissenting).
[48] Id., 408 U.S. at 309-310, 92 S.Ct. at 2762, 33 L.Ed.2d at 390 (1970) (Stewart, J., concurring).
[49] Id., 408 U.S. at 364-366, 92 S.Ct. at 2790-2791, 33 L.Ed.2d at 421-422 (Marshall, J., concurring).
[50] See Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).
[51] Furman v. Georgia, 408 U.S. 238, 290, 92 S.Ct. 2726, 2752-2753, 33 L.Ed.2d 346, 378-379 (1972) (Brennan, J., concurring).
[52] Id. 408 U.S. at 342, 92 S.Ct. at 2779, 33 L.Ed.2d at 408 (Marshall, J., concurring).
[53] Id. 408 U.S. at 291, 92 S.Ct. at 2753, 33 L.Ed.2d at 379 (Brennan, J., concurring).
[54] Id. 408 U.S. at 309, 92 S.Ct. at 2762, 33 L.Ed.2d at 390 (Stewart, J., concurring).
[55] Id. 408 U.S. at 311, 92 S.Ct. at 2763, 33 L.Ed.2d at 391 (White, J., concurring).
[1] U.S.Const. Art. VI, cl. 2, provides:

"This Constitution and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."
[2] Irvin v. Dowd, 359 U.S. 394, 79 S.Ct. 825, 3 L.Ed.2d 900 (1959); Smith v. O'Grady, 312 U.S. 329, 61 S.Ct. 572, 85 L.Ed. 859 (1941); United States v. Bank of New York and Trust Company, 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936); Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).
[3] 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
[4] Section 921.141, Florida Statutes, 1971, F.S.A., which provided: "A defendant found guilty by a jury of an offense punishable by death shall be sentenced to death unless the verdict includes a recommendation to mercy by [a majority of] the jury. When the verdict includes a recommendation to mercy by [a majority of] the jury, the court shall sentence the defendant to life imprisonment. A defendant found guilty by the court of an offense punishable by death [on a plea of guilty or] when a jury is waived shall be sentenced by the court to death or life imprisonment." (Emphasis supplied.)

Of course, according to its normal usage, the word "shall" in a statute has a mandatory connotation. See City of Orlando v. County of Orange, 276 So.2d 41, 43, n. 4 (Fla. 1973), citing Neal v. Bryant, 149 So.2d 529 (Fla. 1962).
[5] Section 921.141, Florida Statutes, as amended by Chapter 72-724, Laws of Florida, which provides:

"(1) Upon conviction or adjudication of guilt of a defendant of a capital felony the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death or life imprisonment as authorized by section 775.082. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If the trial jury has been waived or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury empaneled for that purpose unless waived by the defendant. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (6) and (7) of this section. Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements; and further provided that this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Florida. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.
"(2) After hearing all the evidence, the jury shall deliberate and render an advisory sentence to the court based upon the following matters:
"(a) Whether sufficient aggravating circumstances exist as enumerated in subsection (6), and
"(b) Whether sufficient mitigating circumstances exist as enumerated in subsection (7), which outweigh aggravating circumstances found to exist, and
"(c) Based on these considerations whether the defendant should be sentenced to life or death.
"(3) Notwithstanding the recommendation of a majority of the jury, the court after weighing the aggravating and mitigating circumstances shall enter a sentence of life imprisonment or death, but if the court imposes a sentence of death, it shall set forth in writing its findings upon which the sentence of death is based as to the facts:
"(a) That sufficient aggravating circumstances exist as enumerated in subsection (6), and
"(b) That there are insufficient mitigating circumstances, as enumerated in subsection (7), to outweigh the aggravating circumstances.
In each case in which the court imposes the death sentence, the determination of the court shall be supported by specific written findings of fact based upon the circumstances in subsections (6) and (7) and based upon the records of the trial and the sentencing proceedings.
"(4) If the court does not make the findings requiring the death sentence, the court shall impose sentence of life imprisonment in accordance with section 775.082.
"(5) The judgment of conviction and sentence of death shall be subject to automatic review by the Supreme Court of Florida within sixty (60) days after certification by the sentencing court of the entire record unless time is extended an additional period not to exceed thirty (30) days by the Supreme Court for good cause shown. Such review by the Supreme Court shall have priority over all other cases, and shall be heard in accordance with rules promulgated by the Supreme Court.
"(6) Aggravating circumstances.  Aggravating circumstances shall be limited to the following:
"(a) The capital felony was committed by a person under sentence of imprisonment;
"(b) The defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person;
"(c) The defendant knowingly created a great risk of death to many persons;
"(d) The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit any robbery, rape, arson, burglary, kidnaping, aircraft piracy, or the unlawful throwing, placing or discharging of a destructive-device or bomb;
"(e) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody;
"(f) The capital felony was committed for pecuniary gain;
"(g) The capital felony was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of laws.
"(h) The capital felony was especially heinous, atrocious or cruel.
"(7) Mitigating circumstances.  Mitigating circumstances shall be the following:
"(a) The defendant has no significant history of prior criminal activity;
"(b) The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance;
"(c) The victim was a participant in the defendant's conduct or consented to the act;
"(d) The defendant was an accomplice in the capital felony committed by another person and his participation was relatively minor;
"(e) The defendant acted under extreme duress or under the substantial domination of another person;
"(f) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
"(g) The age of the defendant at the time of the crime."
(Emphasis supplied).
[6] Compare Section 782.04(1)(a), Florida Statutes, as amended by Chapter 72-724, Laws of Florida:

"The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed by a person engaged in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, or which resulted from the unlawful distribution of heroin by a person over the age of seventeen (17) years when such drug is proven to be the proximate cause of the death of the user shall be murder in the first degree and shall constitute a capital felony, punishable as provided in § 775.082." (Emphasis supplied.)
with Section 782.04(2), Florida Statutes, as amended by Chapter 72-724, Laws of Florida:
"When perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery, burglary, kidnaping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb, except as provided in subsection (1), it shall be murder in the second degree and shall constitute a felony of the first degree, punishable by imprisonment in the state prison for life, or for such term of years as may be determined by the court." (Emphasis supplied.)