313 So.2d 666 (1975)
John A. SPINKELLINK, Appellant,
v.
STATE of Florida, Appellee.
No. 44805.
Supreme Court of Florida.
February 19, 1975.
Rehearing Denied May 8, 1975.
*668 Brian T. Hayes, Monticello, and Ken Davis, Tallahassee, for appellant.
Robert L. Shevin, Atty. Gen., and Michael M. Corin, Asst. Atty. Gen., for appellee.
BOYD, Justice.
This cause is before us on direct appeal from the Circuit Court, Leon County. Appellant was convicted of murder in the first degree and was sentenced to death, thereby giving this Court jurisdiction of this appeal.[1]
The pertinent facts appear as follows. The 24 year old Appellant picked up Joseph J. Szymankiewicz, a hitchhiker, while traveling in the mid-west; both men had criminal records, and both were heavy drinkers. During their travels Appellant learned first hand of Szymankiewicz's vicious propensities when the latter forced him to have homosexual relations with him, when the latter played "Russian Roulette" with him and boasted of killing a fellow inmate while in prison. After checking into a motel in Tallahassee, Appellant discovered that his traveling companion had relieved him of his cash reserves. Appellant concluded that it would be wise to continue his journey without Szymankiewicz, and, having had his car washed, Appellant admits that he returned to the motel to remove his personal belongings and to force Szymankiewicz to return the money stolen from him. On his return to the motel, he picked up one Frank Bruum, another hitchhiker, and agreed to take him as far as New Orleans. Appellant's testimony is of interest at this juncture:
"We started back toward the motel and I told this guy, I said, `If you don't mind waiting a little ways from the motel, I think it would be better, because there is another guy in the motel room that is pretty drunk. He's going to be mad because I was gone this long.' And I didn't mention nothing to the hitchhiker about Joe taking my money or hiding my money. And  well, I dropped him off a little ways from the motel and I told him if he should happen to hear a gunshot or something, it's in the Ponce de Leon Motel in No. 4. And so what I intended on doing was carrying the [Joe's] gun on me and going into the motel room, and if I had to, by pointing the gun I was going to pick up my baggage and leave that motel room." (Emphasis supplied.)
He also testified that he hid the pistol in his clothing; and while admitting that he had fired the gun that killed Szymankiewicz, Appellant sought to show mitigating circumstances by showing, first, that he was carrying the gun because he was afraid for his own life, and, secondly, that the gun discharged during a fight between the two. The evidence shows that, although Szymankiewicz was shot once in the head, he died from a second bullet fragmenting the spine and rupturing the aorta. It is undisputed that Appellant prepared a cover story to delay discovery of the body, giving him the opportunity to leave with Bruum.
Less than one week later Appellant, along with two others, was in custody for suspicion of armed robbery in Buena Park, California. One of the other suspects was John Moore, a hitchhiker who had been picked up in Texas by Appellant (alias Derek or Derk) and another known to Moore only as Frank. The California police learned that all three had signed the apartment lease, Moore signing as "uncle" to "Derek" and Frank; the authorities, having secured Moore's verbal permission to *669 search the apartment and having the use of his key, discovered an intoxicated Frank Bruum at the apartment and placed him under arrest for suspicion of armed robbery. A search ensued, and in an open kitchen drawer was found the gun that later proved to be the murder weapon in Szymankiewicz' death.
After their California arrest, Bruum and Appellant were returned to Florida and tried for first degree murder. The jury returned a verdict of guilty as to Appellant and not guilty as to Bruum. After a subsequent mitigation trial, the jury brought in its advisory verdict recommending that the court impose a sentence of death on Appellant. The trial judge, having considered this advisory verdict, sentenced Appellant to death, filing the appropriate findings of facts. This appeal followed.
Initially, Appellant challenged the constitutionality of Sections 782.04 and 921.141, Florida Statutes, under which he was convicted, but he waived this point on appeal in light of this Court's ruling in State v. Dixon.[2]
Next, Appellant challenges the correctness of the court's ruling permitting into evidence the gun seized during the warrantless search of his California residence. Appellant contends that the search was not incident to a lawful arrest;[3] it appears, however, that this position is based on the belief that "the gun was found in [Appellant's] bedroom in a drawer". Since co-defendant Bruum, who appeared "high", was arrested in the living area common to all tenants and since he was placed in a chair (albeit, handcuffed) in the dining area only eight feet from the common kitchen, Appellant's objection would be understandable had the gun in fact been removed from a drawer in his private bedroom, which was some twenty-five feet away from Bruum. In light of the fact, however, that the record clearly shows the gun to have been found in an open drawer in the common kitchen, it would appear to fall into the "plain view" exception which permits a warrantless seizure.[4] This Court has held that the lower court properly denied a defendant's motion to suppress certain evidence when it was taken from an area not exclusively used by the defendant, especially when consent was given to the search by a cotenant.[5] While it is true that the drawer was open only about eight inches, through that opening the investigating officer could easily see a hypodermic needle with a yellow plunger attached, which justified his opening the drawer completely, thereby exposing the gun. Furthermore, since Bruum was only a few feet away from the drawer containing the gun, it falls within the "search incident to arrest" exception recognized in Chimel, supra,[6] whereby it has been held reasonable for the arresting officer to search the area into which an arrestee might reach in order to grab a weapon or evidentiary items. In Chimel, the court specifically observed that "[a] gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested."[7] We find the trial court was correct in holding the search and seizure to be constitutional.
The next point for determination is Appellant's assertion that the court erred in denying his motion for acquittal, which was based on the alleged lack of evidence of the requisite element of premeditation. *670 It is Appellant's position that, while he shot the deceased, it was in self defense. Admittedly, the evidence clearly shows that the deceased was an individual of vicious temperament and that Appellant was justified in concluding that he would do well to sever their relationship, continuing his odyssey without his companion. Nevertheless, the evidence also is clear that Appellant was alone in his car away from the motel with the opportunity for leaving Szymankiewicz and did not do so; instead, he voluntarily returned to the motel with the deceased's gun hidden, telling Bruum "if he should happen to hear a gunshot or something, it's in the Ponce de Leon Motel in No. 4". Additionally, although Appellant claims the gun was fired during a violent, life-or-death struggle with deceased in which he was fighting for his life, the firearms examiner testified that the laboratory test-firing reproduced the pattern of powder residue found on the outer surface of the pillow case so as to indicate that the weapon was fired alongside the pillow rather than through it. Furthermore, Appellant did not contradict the evidence that he established a cover-up which enabled him to flee the scene of the crime with Bruum, saying merely that he remembers nothing after the first shot was fired. The rule is that, when a suspect endeavors to evade prosecution by flight, such fact may be shown in evidence as one of the circumstances from which guilt may be inferred.[8]
Keeping these facts in mind, we note that, when Appellant moved for an acquittal, he admitted the facts adduced in evidence and every conclusion favorable to the Appellee which is fairly and reasonably inferable therefrom.[9] Additionally, it has been held that premeditation may be established by circumstantial evidence; in Larry v. State,[10] this Court said:
"Premeditation, like other factual circumstances, may be established by circumstantial evidence. Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted. It must exist for such time before the homicide as will enable the accused to be conscious of the nature of the deed he is about to commit and the probable result to flow from it in so far as the life of his victim is concerned. No definite length of time for it to exist has been set and indeed could not be... ."
Even before that case, this Court had stated that:
"A premeditated design to effect the death of a human being is a fully formed and conscious purpose to take human life, formed upon reflection and deliberation, entertained in the mind before and at the time of the homicide ... If the design to take human life was formed a sufficient length of time before its execution to admit of some reflection and deliberation on the part of the party entertaining it, and the party at the time of the execution of the intent was fully conscious of a settled and fixed purpose to take the life of a human being, and of the consequence of carrying such purpose into execution, the intent or design would be premeditated within the meaning of the law although the execution followed closely upon formation of the intent."[11]
*671 It seems clear in this case that Appellant expected to use the gun when he warned Bruum that, should the latter happen to hear a gunshot, it would be in his motel room.
We have not neglected to consider Appellant's remaining point on appeal, i.e., that the trial court erred in admitting into evidence a particular photograph which he considers to have been unduly gruesome and irrelevant; however, since Appellant's "Directions to Clerk" do not include the exhibits admitted below, the photograph is not a part of the record on appeal in this Court.
We are mindful of the principle that a judgment of conviction comes to this Court with a presumption of correctness and that a defendant's claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment.[12] It appears that there is substantial evidence to support both the jury's verdict and the sentence sub judice and, absent a clear showing that the jury erred as a matter of law, the finding of a jury will not be disturbed.[13]
As more fully set out above the record shows this crime to be premeditated, especially cruel, atrocious, and heinous and in connection with robbery of the victim to secure return of money claimed by Appellant. The aggravating circumstances justify imposition of the death sentence. Both Appellant and his victim were career criminals and Appellant showed no mitigating factors to require a more lenient sentence.
The Appellant having failed to demonstrate error in either the denial of his motion for judgment of acquittal or any of the other points on appeal, his conviction of murder in the first degree and sentence of death are hereby affirmed.
It is so ordered.
ADKINS, C.J., ROBERTS, McCAIN and OVERTON, JJ., and COE, Circuit Court Judge, concur.
ERVIN (Retired), J., dissents with opinion.
ERVIN (Retired), Justice (dissenting):
The majority opinion does not treat upon the constitutionality of Florida's death penalty statutes, Sections 782.04 and 921.141, F.S. because Appellant Spinkellink, in deference to this Court's majority decision in State v. Dixon (Fla. 1973), 283 So.2d 1, upholding the constitutionality of these sections, did not challenge their validity in his appeal.
I got the feeling at the oral argument herein that counsel for Appellant thought it was the best strategic tactic not to raise or flout anew the issue of the validity of the death penalty statutes in the light of the majority view in Dixon but to concentrate on other points in the appeal, hoping they would be more favorably considered by the Court if no challenge was made of the majority view in Dixon.
However, I do not believe we can conscientiously pass over the matter of the constitutionality of the death penalty statutes in this case. The death penalty was imposed directly upon Spinkellink, while in Dixon we only considered certified questions which raised general questions as to the statutes' validity without reference to an actual case where the death penalty was imposed. Moreover, the question of the validity of a state statute imposing the *672 death penalty is a live, unsettled one in the United States which under my oath to uphold the constitutions requires me in an actual case of imposition, I believe, to express my constitutional views thereon.
This death penalty case and the majority opinion affirming represent an erratic throwback to the Nineteenth century and is typical of the atavistic thinking indigenous to that century. The majority affirmance clearly conflicts with the rationale of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). It reinstates with vindictive vengeance much of the old death penalty mechanisms which Furman deplored. It places in the jury the discretion to propose the death penalty under unspecific general standards. The trial judge then has the discretion to agree or disagree with the jury as to the death sentence, subject to further similar exercise of discretion by this Court on appeal.
We have cases pending before us where juries proposed life imprisonment but the trial judges decided the death penalty was appropriate, which demonstrates the extent discretion can statutorily operate.
There are no realistic standards prescribed as to the specific circumstances under which the death penalty may be imposed; only very general ones wholly at variance with Furman. The cruel and unusual aspects of the death penalty in full panoply are back in business under our statutes and the Dixon case. Discretion to impose death is now a triune process which may be exercised in varying degrees by the jury, the trial judge, and the Florida Supreme Court. Contrary to Furman no clear demarcation is set forth in the Florida death penalty statutes as to those crimes that are to draw the death penalty and those which are not. Whether the death sentence should be imposed has not become a matter of law, as Furman suggests might possibly be provided under the Federal Constitution; instead, the state in its statutes has returned to the old practice of discriminatory discretion.
And as usual under "discretion" it is left to sentencing judges to determine in particular cases who will get death. We know intuitively who will: the poor, the underprivileged, the public defender clients; the blacks and other minority people, the mentally incompetent and those holding unpopular or unorthodox ideologies. The affluent usually escape the death penalty.
The majority rationale in Furman was calculated to avoid the traditional sentencing discretion which brings in its train state jury and judge "pick and choose" elements of emotion, passion, prejudice, parochialism and personal predilections and aberrations. Deep down the rationale of that decision was to remove vindictive vengeance, class or race hatreds and prejudices, and allay the mistaken concept that the death penalty is a meaningful deterrent. In a word, the object of Furman was to read the Constitution in terms of the Twentieth Century.
National standards for imposition of the death penalty pursuant to modern understanding of pertinent provisions of the United States Constitution are necessary for the protection of United States citizens, assuming, of course, any death penalties are to be meted. These standards according to the rationale of Furman should eschew all of the old nuances of passion, vindictive vengeance, parochial or provincial prejudices  as well as the psychological and philosophical predilections of the individual judge which often due to his upbringing affect his judgment as to whether the death penalty should be imposed in the particular case.
Judgments of juries and judges will vary on the question of death penalty imposition depending upon a variety of things, some of which are the influence of regional, environmental or educational considerations, or of one's religion, constitutional understanding and knowledge of history and human nature.
*673 Justice Boyd pointed out in his dissent in State v. Dixon, supra, that:
"Under the old system, a majority of the twelve member jury, in the exercise of their discretion, determined the nature of the punishment. Under the new law, to the exercise of that discretion is added the opportunity for the arbitrary, completely unfettered, and final exercise of discretion by the judge. Clearly, the new law provides for even more discretion than the quantum thereof condemned in Furman.

"With the same objectivity as a merchant measuring cloth, I have compared the new Florida capital punishment statute with Federal Constitutional standards, and find said law to be unconstitutional." (283 So.2d 1, 26.)
Evidently Justice Boyd in his opinion for the majority here measures the cloth with a different constitutional ruler than he did in Dixon. However, the merchandise to be measured is no different  it's a question of life or death right on.
In my dissent in Dixon I concluded:
"It is therefore my conclusion that Section 921.141, Florida Statutes, F.S.A., is unconstitutional because: (1) the statute does not sufficiently eliminate the discretion in imposing the death penalty which Furman condemns; (2) the State has failed to consider or present sufficient proof upon which it may be concluded that the death penalty for a citizen of the United States is justified by a compelling state interest; (3) Florida must comply with national standards as enunciated by the Supreme Court of the United States in imposing a state death penalty; (4) Florida should not apply a death penalty of greater degree and kind to its citizens than do other states  perhaps Florida should await action of the Congress in prescribing the death penalty, if any, according to national standards enunciated by the United States Supreme Court because of the Federal citizenship of the nation's citizens, included Floridians." (283 So.2d 1, 23.)
In this case it appears that Appellant at the time of the homicide was a 24-year-old drifter who picked up Szymankiewicz, a hitchhiker. Both had criminal records and both were heavy drinkers. Szymankiewicz, the victim in this case, was a man of vicious propensities who boasted of killings and forced Appellant to have homosexual relations with him. Appellant discovered that Szymankiewicz had "relieved him of his cash reserves."
It was under these conditions that Appellant returned to the motel room where the homicide occurred. Appellant testified he shot Szymankiewicz in self defense. Evidence to the contrary was only circumstantial. In fact, only through such evidence was it possible to infer the crime was premeditated and different from Appellant's direct testimony that he shot Szymankiewicz in self defense. The reasoning of this Court on the suddenness in which premeditation may be formed is suspect and allowed the prosecution undue latitude to readily shift from the theory of felony murder to premeditated murder.
It does not appear to me that in this situation there was sufficient certainty of premeditated guilt and heinousness to warrant the death penalty. When the nature of the relation between Appellant and Szymankiewicz is taken into account, along with the viciousness of the victim's character and his theft of Appellant's money, it is obvious that hostility existed between them that could have produced a mortal encounter that involved self-defense shooting.
The State's claim of premeditation is tenuous and based upon dubiously drawn simplistic reasoning which to be applicable in this case requires the straining of circumstantial inferences.
From the standpoint of certainty and innate heinousness, this case hardly appears to justify the death penalty. There are little or no precise standards therefor comporting *674 with provisions of the Constitution against cruel and unusual punishments in Section 921.141, F.S. for imposing the death sentence. Those which are prescribed in Section 921.141(5), as aggravating circumstances, are in such general terms as to invite arbitrary discretion. But in this case the evidence does not by reasonable inference beyond reasonable doubt disclose that the Appellant shot the victim in any robbery, rape, arson, or burglary, or for pecuniary gain. Neither was it clearly proved the alleged felony was especially heinous, atrocious, or cruel, since the evidence is not clear and convincing the shooting was not in self defense unless we are agreeing that in Florida any shooting under disputed and circumstantial facts of this kind falls in such category.
There is inconsistency between the trial judge's findings on sentencing and the majority's opinion. The trial judge appears to restrict his findings to concluding a felony murder was committed for pecuniary gain while the majority opinion rests its judgment not only on felony murder, but also on sudden premeditation to kill. This inconsistency on the exact predicate for imposing the death sentence between the trial court and this Court is extremely prejudicial and should not be left unresolved.
Truly characterized, the sentencing to death here is an example of the exercise of local arbitrary discretion. The two actors in the homicide were underprivileged drifters. Their surnames, Spinkellnik and Szymankiewicz, were foreign and strange to the Tallahassee area. They had no family roots or business connections here. All of the ingredients were present for the exercise of inviduous parochial discrimination in the sentencing process which the plural opinions of the majority in Furman condemned. The result here is an old story, often repeated in this jurisdiction where the subconscious prejudices and local mores outweigh humane, civilized understanding when certain segments of the population are up for sentencing for murder. Twentieth Century enlightenment in the United States as a whole nation considers the death penalty in this case to be cruel and unusual punishment.
The recurring question of whether the death penalty that may be imposed pursuant to constitutional limitation is a deterrent to murder brings many thoughful persons of note to answer to the contrary.
"As Williams [Edward Bennett Williams, Professor of Criminal Law, Georgetown University Law Center] puts it, `It is inhuman because its deterrent effects are now recognized as a myth. It is unjust because it leaves no remedy for a mistake. It is unequal because it is exacted almost exclusively of the poor and ignorant.'
* * * * * *
"... The finality of the death penalty makes it impossible to correct those errors of judgment which occasionally find their way into the administration of the criminal law. In the words of Judge Jerome Frank, `No one knows how many innocent men, erroneously convicted of murder, have been put to death by American governments for, once a convicted man is dead, all interest in vindicating him generally evaporates.'
* * * * * *
"... Governor Edmund G. Brown [1960 Message to the California Legislature] concluded: `The naked, simple fact is that the death penalty has been a gross failure. Beyond its horror and incivility, it has neither protected the innocent nor deterred the wicked. The recurrent spectacle of publicly-sanctioned killing has cheapened human life and dignity without the redeeming grace which comes from justice meted out swiftly, evenly, humanely.'
* * * * * *
"Warden Lewis E. Lawes of Sing Sing fame expressed my sentiments forcefully when he observed that `the death penalty *675 is a relic of savagery, perpetrated by custom and in ignorance, maintained by false assumptions and consummated in a killing that is legal in name only; it is illogical and inconsistent with religion and morality; it condones an act of an agent that would be murder for an individual; it carries out in secrecy what would be revolting in public; it is manmade and fallible and, therefore, subject to gross miscarriage of justice; it is ineffective and sets and example for murder.'"[1]
It is a hard lesson for groping, imperfect humans to learn that governmentally or societally imposed violence of death with its cruel finality is no deterrent to murder. Rather, it stigmatizes the state that imposes the death penalty as base, uncivilized, vengeful and barbarous. Officially imposed death dehumanizes and debases a state's claim to civilized status. State bloodletting begets harsh cruelty and lack of compassion among a people  it is the antithesis of all that Christ taught.
It is my view the death penalty should not be imposed in this case, only life imprisonment.
NOTES
[1] Article V, Section 3(b) (1), Florida Constitution; Section 921.141(4), Florida Statutes.
[2] 283 So.2d 1 (Fla. 1973).
[3] Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685.
[4] Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, reh. den. 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120.
[5] Rivers v. State, 226 So.2d 337 (Fla. 1969).
[6] See Note 3, at 763, 694.
[7] Id.
[8] Daniels v. State, 108 So.2d 755 at 760 (Fla. 1959).
[9] Victor v. State, 141 Fla. 508, 193 So. 762 (1940).
[10] 104 So.2d 352 (Fla. 1958) at 354.
[11] McCutchen v. State, 96 So.2d 152 (Fla. 1957).
[12] Anderson v. State, 24 Fla. 139, 3 So. 884 (1888); Wetherington v. State, 263 So.2d 294 (Fla.App. 1972).
[13] Pearsall v. State, 215 So.2d 58 (Fla.App. 1968), cert. den. 396 U.S. 912, 90 S.Ct. 228, 24 L.Ed.2d 188.
[1] Hoomissen, "The Death Penalty  Reformation or Vindicative Justice?" Journal of the National District Attorneys Association, July-August 1965, Vol. 1, No. 3.