918 So.2d 369 (2005)
Daniel John MAGLIO, Appellant,
v.
STATE of Florida, Appellee.
No. 4D03-3442.
District Court of Appeal of Florida, Fourth District.
December 21, 2005.
Rehearing Denied February 10, 2006.
*372 John Olea of John Olea, P.A., Palm Beach Gardens, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Laura Fisher Zibura, Assistant Attorney General, West Palm Beach, for appellee.
POLEN, J.
Daniel Maglio timely appeals a conviction, following a jury trial, for second degree murder and a sentence of life in prison. We affirm.
Maglio was convicted as charged of the second degree murder of Jeffrey Shubin. The following evidence was adduced at trial:
On June 17, 1997 at approximately 6:25 a.m., Detective Paul Yesbeck responded to a dumpster fire in Hallandale Beach. Both the dumpster and the body of Jeffrey Shubin on the ground next to the dumpster were engulfed in flames. Doctor Flanagan, a forensic pathologist, testified that the victim had been deceased a few days when he was burned, based on the significant amount of decomposition. The general timeframe for when Shubin was killed was between June 12 and 17. The cause of death was blunt head trauma. Flanagan testified that the injuries were consistent with someone bashing his head in with a wrench. Underneath Shubin's face, there were several skull fractures, as well as fractures of the facial bones and jaw. Flanagan testified that it would take a large amount of force to cause that degree of fracture.
Detective Daniel Semkow, the lead investigator assigned to the case, encountered Maglio two times on June 17, 1997, the day the burning body was discovered. Semkow first encountered Maglio at approximately 9:30 a.m.-10:00 a.m. in front of the apartment building. Maglio told Semkow that he lived in apartment number 3 and that he had been out all night and not in his apartment. He claimed he had spent the night with Kimberly Segar at the Beach House Inn and was just returning. An officer went to the Beach House that day to investigate. The officer met with Kimberly Segar and Romano Ceravolo, who were renting a room there. At the Beach House, the officer found Shubin's gym shoes in a trash can. The shoes smelled very rancid like rotting flesh. Maglio's DNA was found on the right shoe.
Detective Semkow encountered Maglio again at approximately 1 p.m. the day the burning body was discovered. Maglio was coming out of his apartment with another man and was locking the door. Maglio again claimed that he had been out all night and that he had just gotten home the first time Semkow saw him at around 10:00 a.m.
Detective Yesbeck investigated Maglio's apartment during the area canvas following the discovery of the burning body. No one answered the door when the officer knocked. The window was slightly ajar and Yesbeck could smell what smelled like a deceased person inside. He also observed dead flies on the window sill, which sometimes indicated that maggots had started to grow on the body and turn into *373 flies. Photographs of drag marks coming from Maglio's apartment building were introduced into evidence.
A search of Maglio's apartment revealed a pipe wrench lying on the floor next to Maglio's bed, from which blood was extracted for DNA testing. DNA specialist Donna Marchese matched the blood on the wrench found in Maglio's apartment to an oral swab of the victim. There were no fingerprints on the wrench. Officers also found a trash can containing a pair of hospital scrubs belonging to Maglio, which were partially burned, with what appeared to be human tissue on the trousers. There was blood in Maglio's apartment on the mattress, the headboard, and the floor leading to the bathroom. The mattress was drenched in blood. The DNA of the blood on the mattress matched Shubin's. Three white socks, a towel, and a sheet found in a trash bag were also blood soaked. The bed was completely soaked in blood, the items stained in blood were removed from the bed, and the bed was remade. The apartment was very filthy, but the bathroom tub and sink had been cleaned. Based on the blood found at the crime scene, law enforcement concluded that the homicide occurred in Maglio's bedroom.
The police also noticed brush marks of some kind of paint on the wall above Maglio's headboard. A Kilz Stain Blocker paint can was found underneath Maglio's bed with a brush on top. The blood found in the painted-over drywall from above Maglio's headboard matched Shubin's DNA. Additionally, Maglio's fingerprints were found on the Kilz paint can. Detective Semkow learned that Shubin had been evicted from his trailer and was living in Maglio's apartment at the time of his death. Semkow also learned that people often came and went from Maglio's apartment. One of these people was Kimberly Segar. Semkow also testified that he explored the possibility that the killing was related to drugs.
Gerald Kairnes worked at the nearby Chevron gas station and lived in number 4 of the subject apartment building. Kairnes testified that at 5:38 a.m. on the morning the body was found burning, Maglio purchased a dollar's worth of gasoline from him and put it in an empty can. Maglio took the can with the gasoline and headed north on U.S. 1. Kairnes got off of work at 6:57 a.m. He also headed north on U.S. 1, in the same direction Maglio had walked away from the Chevron station, and came upon the crime scene. Kairnes picked Maglio out of a photograph lineup as the one he sold the dollar's worth of gasoline to that morning. Forensic chemist Randy Hilliard testified that the blanket the body was wrapped in and the debris found under and around the body revealed the presence of gasoline.
Roger Pace, who lived in apartment 4 with Kairnes, shared a common wall with Maglio's apartment. Leading to the day of the burning body, he noticed a terrible odor that kept getting worse. Pace smelled the odor for three or four days and it kept getting stronger. Pace also testified that on June 17, 1997 between 8:00 and 8:30 a.m., he saw Maglio exit his apartment alone.
Pace testified that in the week immediately preceding the week of the discovery of the body there was "quite a bit" of traffic in and out of Maglio's apartment. However, during the week right before the body was discovered, there was very little traffic. He also did not hear anything out of the ordinary during the week the body was found. Pace did not remember if he saw Maglio during the several days before the discovery of the body. Pace also testified that he once saw a lady he knew as Kim breaking into Maglio's apartment *374 through the kitchen window. Pace had seen Kim in the company of men coming and going in Maglio's apartment on several occasions. He also said that they had a lot of trouble with people coming and going through a gate on the side of the apartment building.
Maglio did not testify at trial, nor did he provide any witnesses in his defense.
Maglio first argues that the trial court erred in denying his motion for judgment of acquittal. "The standard of review for a court's denial of a judgment of acquittal is de novo." Sampson v. State, 863 So.2d 404, 405 (Fla. 4th DCA 2003) (citation omitted). In addressing the question of sufficiency of the evidence when moving for a judgment of acquittal, Maglio admits the facts adduced in evidence and every conclusion favorable to the state which is fairly and reasonably inferable therefrom. Spinkellink v. State, 313 So.2d 666, 670 (Fla.1975), cert. denied, 428 U.S. 911, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1976). "The trial court should not grant a motion for judgment of acquittal unless there is no view of the evidence which the jury might take favorable to the State that can be sustained under the law." Scott v. State, 693 So.2d 715 (Fla. 4th DCA 1997) (citation omitted).
By the motion, a defendant admits all facts introduced into evidence and the court must draw every inference favorable to the prosecution. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Corpuz v. State, 733 So.2d 1048, 1049-1050 (Fla. 4th DCA 1999). A trial court should deny a motion for judgment of acquittal "[w]here there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts." Lynch v. State, 293 So.2d 44, 45 (Fla.1974). "The credibility and probative force of conflicting testimony should not be determined on a motion for judgment of acquittal." Id.
In the present case, Maglio argues that the State failed to rebut his hypothesis of innocence, i.e., that Kimberly Segar or Romano Ceravolo or someone else committed the murder. Because the State presented only circumstantial evidence, a special standard of review applies. That standard is whether the evidence is inconsistent with any reasonable hypothesis of innocence. As the Florida Supreme Court explained in State v. Law, 559 So.2d 187 (Fla.1989):
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
. . .
A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. Consistent with the standard set forth in Lynch, if the state does not offer evidence which is inconsistent with the defendant's hypothesis, "the evidence [would be] such that no view which the jury may lawfully take of it favorable to the [state] can be sustained *375 under the law." 293 So.2d at 45. The state's evidence would be as a matter of law "insufficient to warrant a conviction." Fla. R.Crim. P. 3.380.
It is the trial judge's proper task to review the evidence to determine the presence or absence of competent evidence from which the jury could infer guilt to the exclusion of all other inferences. That view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events. Once that threshold burden is met, it becomes the jury's duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
Id. at 188-89 (citations and footnote omitted) (emphasis added).
In this case, the State presented "competent evidence which is inconsistent with [Maglio's] theory of events." Maglio told law enforcement officers that he had spent the night of June 16, 1997, at the Beach House with Kimberly Segar and that he did not return to his apartment until around 10:00 a.m. on June 17, the morning the burning body was discovered. However, one witness placed Maglio at his apartment at 8:15 a.m. on June 17 and another witness placed Maglio in the vicinity of his apartment at 5:38 a.m. on June 17. Additionally, a witness testified that Maglio purchased a gallon of gasoline in an empty can from a service station within walking distance of his apartment at 5:38 a.m. on June 17 and began walking with the can towards his apartment. Shubin's body was found burning in gasoline less than an hour later. This evidence is clearly inconsistent with Maglio's theory of events that he had spent the night of June 16, 1997 at the Beach House with Kimberly Segar and that he did not return to his apartment until around 10:00 a.m. on June 17.
While we have concluded that the factual circumstances in this case, as described above, were sufficient to rebut Maglio's reasonable hypothesis of innocence, we believe that the absence of any of these facts might have tipped the scales in the other direction. Nonetheless, here, under the special standard as articulated in Law, the State met its burden "to introduce competent evidence which is inconsistent with the defendant's theory of events" and therefore the trial court properly denied Maglio's motion for judgment of acquittal. The burden of determining whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt properly became the province of the jury.
Second, Maglio argues that the trial court erred in imposing an upward departure sentence, claiming that the level of proof for departure was never met. The trial court imposed an upward departure sentence citing four grounds, which are as follows:
The fact that the victim was beaten to death with a pipe wrench and left in the apartment for days decomposing and then set on fire to mask the murder, the Court finds that to be heinous, atrocious and cruel. Second, the victim suffered extraordinary physical or emotional trauma or permanent physical injury, or was treated with particular cruelty by the facts of the case and evidence that was heard at trial.
The defendant was not amenable to rehabilitation or supervision, as evidenced by an escalating pattern of criminal conduct as describe[d] in 921.001(8) *376 and finds that h[is] criminal history of voluntary manslaughter, aggravated robbery and escape in Ohio in addition to all the Florida convictions that escalating pattern of criminal activity.
That he would not be amenable to rehabilitation and the Court finds the defendant's primary offense is scored at offense level seven or higher and the defendant has been convicted of one or more offense that scored, or would have scored, at an offense level eight or high[er], that being aggravated robbery and voluntary manslaughter.
Maglio argues that the first two grounds for departure  the heinous nature of the crime and the extraordinary physical trauma suffered by the victim  violated his rights under the Sixth Amendment because they required a jury finding under Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and U.S. v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (U.S.2005). Although Maglio did not argue Apprendi at sentencing, his claim can proceed under the Blakely and Booker rationales, both of which were decided after Maglio was sentenced. See Behl v. State, 898 So.2d 217, 222 (Fla. 2d DCA 2005) ("Although Blakely and Booker were decided after Behl was sentenced, the rule they articulated with respect to sentences imposed under sentencing guidelines schemes is nonetheless applicable in this direct appeal by Behl of his sentences. `When a decision of [the United States Supreme] Court results in a `new rule,' that rule applies to all criminal cases still pending on direct review.'") (citations omitted).
With regard to the first basis for departure  the heinous nature of the crime  Maglio is correct that it was not a lawful basis for upward departure because the facts supporting that factor were neither admitted by Maglio nor found by a jury. See Apprendi, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435; Blakely, 542 U.S. 296, 124 S.Ct. 2531; Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621.
However, with regard to the second basis for departure  the extraordinary physical trauma suffered by the victim  the jury made the necessary factual finding that the victim suffered extraordinary physical trauma. The jury returned a verdict of "guilty of Second Degree Murder as charged in the Information." A review of the information reveals that it charged that Maglio "did unlawfully kill and murder one Jeffrey Shubin, a human being, by intentionally striking Jeffrey Shubin about his head with a deadly weapon, to-wit: a blunt instrument." Although the jury was not provided the opportunity to check a box on the verdict form stating "extraordinary physical trauma," the factual finding that was necessarily made by the jury is sufficient to support the conclusion that the jury found that Maglio caused "extraordinary physical trauma" to the victim by striking him about the head with a blunt instrument to cause his death. See Hunter v. State, 828 So.2d 1038, 1039 (Fla. 1st DCA 2002) ("Where the information alleges that the crime was committed with a firearm and the jury finds that the defendant committed the crime as charged, the jury has necessarily found use of a firearm.") Therefore, the Sixth Amendment was not violated.
Furthermore, the trial court did not commit error in imposing an upward departure sentence because the preponderance of the evidence supported the third and fourth grounds listed by the trial court. First, the State proved Maglio's prior convictions by a preponderance of the evidence. Evidence of his prior convictions *377 were presented to the trial court at the sentencing hearing, including a certified copy of Maglio's criminal record from the State of Ohio and evidence under seal from the State of Ohio indicating that Maglio ultimately pleaded to manslaughter and aggravated robbery. Thomas Emisck of the latent fingerprint crime laboratory compared fingerprints taken of Maglio for the Ohio convictions with those taken in Florida and confirmed that both sets belonged to Maglio.
The State also proved by a preponderance of the evidence that Maglio's primary offense is scored at level 7 or higher and he has been convicted of one or more offenses that scored, or would have scored, at an offense level 8 or higher. There is no dispute that Maglio's second degree murder conviction is a level 10 offense. The trial court was also correct in finding that his Ohio conviction for aggravated robbery scores as a level 8 or higher. In Florida, aggravated robbery is not a scored offense but robbery with a weapon is a level 8 offense. § 921.0012, Fla. Stat. Under the Ohio statute for aggravated robbery, a robbery committed with a deadly weapon constitutes aggravated robbery. See R.C. § 2911.01(A)(1). Therefore, the trial court did not err in finding that Maglio has been convicted of one or more offenses that scored, or would have scored, at an offense level 8 or higher.
In summary, although the trial court's first basis for the upward departure sentence was erroneous in violation of Maglio's Sixth Amendment rights, the remaining three grounds were correct, as explained above. When multiple reasons exist to support a departure from a guidelines sentence, a departure shall be upheld when at least one circumstance or factor justifies the departure regardless of the presence of other factors found not to justify departure. Day v. State, 746 So.2d 1219, 1220 (Fla. 1st DCA 1999). Therefore trial court did not err in imposing an upward departure sentence.
Based on the foregoing, the judgment and sentence are affirmed.
FARMER and TAYLOR, JJ., concur.