# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D19-2407
_____

KOJO KHAYRALLAH,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

_____

On appeal from the Circuit Court for Duval County.
Angela M. Cox, Judge.

September 14, 2022

PER CURIAM.

AFFIRMED.

LEWIS, J., concurs; TANENBAUM, J., concurs with an opinion; LONG, J., concurs with an opinion.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

TANENBAUM, J., concurring.

Kojo Khayrallah appeals his criminal conviction for electronically submitting to the clerk of court a written threat directed to the chief judge of the Fourth Judicial Circuit. By statute, a person commits a second-degree felony if he "sends or procures the sending of . . . an electronic communication," written by him, "containing a threat to kill or to do bodily injury to the person to whom such [] communication is sent." § 836.10, Fla. Stat. (2017). Khayrallah's principal argument for reversal is that the trial court should have granted him a judgment of acquittal. He asserts that the evidence presented by the State was insufficient to show that the message he addressed to the judge and submitted through the clerk's online portal was in fact "sent" as a "threat to kill or do bodily injury," as those two terms appear in the statute. I now explain why this argument fails.

First, I need to spotlight the message, which was admitted into evidence at trial with proper foundation.[*] Khayrallah sent it to an online comment box on the jury services page of the court clerk's website. Mark Mahon is the chief judge for the Fourth Judicial Circuit. The message, admitted into evidence, went as follows (all formatting in the original):

> This Message is for the The No Good Low Down Bastard Mark Mahon and his Administration. I'm coming for your No good Ass! I'm going to Deal with you! Don't be Mad because I haven't forgot about you! You incompetent political bastard! I got you Peeped also like the other no good OL Bastard John Rutherford! You ain't got rid of me! Remember Allah has my back! I got something for your Ass! Go back to the Pitts of Hell where you come from! No good Low Down Bastard! Tell the Devil that made you that You are not Sufficient and your Incompetence has made t you low Down Sum of Shit! No Good Bastard!

---

[*] Khayrallah's alternative argument, that the trial court erred when it allowed the record of his communication into evidence, goes nowhere.

2

In addition to having this message before it, the jury heard about a message box available on the clerk's website through which someone could submit electronic correspondence. Submission of a message through that box would create a record that would be received by someone in the clerk's office. The message made its way through several staff until it eventually was shown to the chief judge. The jury heard testimony about the duties of the clerk of court, which included receiving and maintaining public correspondence for the judges of the Fourth Judicial Circuit. The testimony also showed that the clerk and his staff worked in the Duval County Courthouse, where the chief judge also worked. The jury could have inferred that Khayrallah knew about this working relationship from the recording they heard of Khayrallah admitting to detectives that he sent the message to "vent" after the chief judge kicked him out of his courtroom (ostensibly where clerk staff would have been as well) in a family law matter.

With the spotlight now having been shone, I look at Khayrallah's argument in favor of a judgment of acquittal. Review on this question is de novo. *Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002). Still, the conviction comes to us "with a presumption of correctness," and Khayrallah's "claim of insufficiency of the evidence cannot prevail where there is substantial competent evidence to support the verdict and judgment." *Spinkellink v. State*, 313 So. 2d 666, 671 (Fla. 1975); *see also Baugh v. State*, 961 So. 2d 198, 203–04 (Fla. 2007).

To be clear, in an appeal of a denial of an acquittal motion, we typically do "not retry [the] case or reweigh conflicting evidence" that was submitted to the jury. *Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981), *aff'd sub nom. Tibbs v. Fla.*, 457 U.S. 31 (1982). Rather, Khayrallah's motion for an acquittal effectively "admitted the facts adduced in evidence and every conclusion favorable to the [State] which is fairly and reasonably inferable therefrom." *Spinkellink*, 313 So. 2d at 670. When we consider whether there is competent, substantial evidence to support the judgment, or whether instead the trial court erred in denying the motion, we resolve "all conflicts in the evidence and all reasonable inferences therefrom [] in favor of the verdict on appeal." *Tibbs*, 397 So. 2d at 1123. Legal sufficiency alone is our concern. *Id.* These principles

3

can be boiled down to the following essence: "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction." *Pagan*, 830 So. 2d at 803.

All of this said, from the evidence I already described, I can conclude with ease that there simply is no purchase in either of Khayrallah's arguments for acquittal: that he did not "send" this message to the chief judge, and that his message was not a threat of physical violence. His offense of conviction is defined in section 836.10, Florida Statutes (2017), which in its entirety states as follows:

> Any person who writes or composes and also sends or procures the sending of any letter, inscribed communication, or electronic communication, whether such letter or communication be signed or anonymous, to any person, containing a threat to kill or to do bodily injury to the person to whom such letter or communication is sent, or a threat to kill or do bodily injury to any member of the family of the person to whom such letter or communication is sent commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

Based on this statute, the trial court instructed the jury that the State had to prove the following elements beyond a reasonable doubt:

> 1. KOJO KARUME AL-ZUBAIR KHAYRALLAH wrote or composed a letter, an electronic communication, or inscribed communication.

> 2. The letter, electronic communication, or inscribed communication contained a threat to kill or do bodily injury to Mark Mahon, Chief Circuit Court Judge of the Fourth Judicial Circuit.

> 3. KOJO KARUME AL-ZUBAIR KHAYRALLAH sent or procured the sending of that letter, electronic

4

communication, or inscribed communication to Chief Judge Mahon.

Before getting to Khayrallah's "sent" argument, I quickly dispose of his contention that the message was not sufficiently specific to constitute a "threat." The statute does not define "threat," and we decline to state as a matter of law whether a message like this one was a threat prohibited by the statute. The only question we ask is whether, resolving all doubts in favor of the State, there was evidence from which a "rational trier of fact" could conclude that Khayrallah's message contained a threat of violence against the chief judge. I would answer that question in the affirmative. The jury heard Khayrallah in his recorded statement describe how upset he was with the chief judge because of how the judge handled his case. To take the evidence in the light most favorable to the State, we need to consider the message in the context of Khayrallah's statement to police. One can see that the letter contains statements such as "I'm coming for your No good Ass"; "I'm going to Deal with you"; "Go back to the Pitts of Hell where you come from"; "I got you Peeped"; "I got something for your Ass!"; and "Tell the Devil that made you that You are not Sufficient." The jury fairly could take these statements, together with Khayrallah's professed anger at the chief judge, and rationally conclude that Khayrallah was not merely telling the chief judge to go to Hell, but suggesting that he was going to come for the chief judge and send the judge there himself. Enough said about this point.

Now I turn to the "sent" argument. Khayrallah tries to make much of the fact that the message went to the clerk's office, meaning it would have had to go through multiple clerk staff before reaching the judge and was uncertain to ever get to him. This contention, though, intimates a misreading of what the statute prohibits. The Legislature has the constitutional authority to "define[] a crime in specific terms," and courts do not have the "authority to define it differently." *State v. Jackson*, 526 So. 2d 58, 59 (Fla. 1988). The statute at hand dates to early last century. The term "send" at the time generally meant to cause something to go, to be dispatched, or to be carried. *Send*, OXFORD ENGLISH DICTIONARY 966–68 (2d ed. 1989). Historically speaking, the verb "send" consistently connoted an action that is complete upon the

object's being set in motion with a destination in mind, even if the object does not actually reach the intended end of the journey. The text of the statute has remained nearly unchanged since 1913, meaning from its enactment until when Khayrallah committed the charged offense, the statute has criminalized merely the act of causing a communication to go or be carried to the person the perpetrator intends to threaten with violence. It does not make a completed crime depend on whether the threatened person ever receives the communication or is affected in some way by it.

In other words, this criminal statute does not specify a necessary result of the prohibited conduct other than the transmitting of the e-mail itself, done in a way that suggests the sender intends for it to go to the person threatened in the communication. The statute does not go further and require that there be receipt by the target. *Cf. Burrage v. United States*, 571 U.S. 204, 210 (2014) (addressing "actual cause" and "legal cause" in the context of a crime requiring "not merely conduct but also a specified result of conduct" (quoting 1 W. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.4(a), 464–466 (2d ed. 2003))). To put a finer point on this, compare this statute with the assault statute, which *does* specify the effect on the threatened person as an element to be proven. *See* § 784.011, Fla. Stat. (defining "assault" in terms of a threat to do violence to another, "an apparent ability to do so," and an act that "creates a well-founded fear in such other person that such violence is imminent"); *cf. King v. State*, 339 So. 2d 172, 172 (Fla. 1976) ("If a crime is itself an attempt to do an act or accomplish a result, there can be no attempt to commit that crime." (quotation and citation omitted)); *Adams v. Murphy*, 394 So. 2d 411, 415 (Fla. 1981) (observing that "no criminal result such as a miscarriage of justice need be proved to establish the crime," so "the crime is fully proven by showing an 'attempt' to commit the crime").

From what is in the text and what is omitted (compared to something like the assault statute just quoted), anyone can see that our lawmaking branch long ago was focused on a public harm centered on a particular act of the perpetrator rather than one tied to whether it ends up harming another person. The Legislature defined the wrong to be criminalized in terms of the public danger that flows from someone who not just thinks about physically

harming another but acts on that thought enough to write out a threat and transmit it. *Cf.* 1 W. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.1 (3d ed. 2017) ("Bad thoughts alone cannot constitute a crime; there must be an act, or an omission to act where there is a legal duty to act."); *id.* § 6.1(b) ("It should also be noted that even bad thoughts plus action do not equal a particular crime if the action is not that which the definition of the crime requires.").

In other words, the Legislature sought to stop the dangerous thoughts in their tracks by criminalizing them the moment they turn into action. *Cf.* 1 W. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 1.2(c) (2d ed. 2003) (observing that "many crimes are so defined that no bad result is required, it being the policy of the criminal law in these cases to punish activity likely to produce bad results if not nipped in the bud").The statute, then, prevents the risk of a greater public harm occurring (actual violence to another, or at least another being placed in fear of such violence) by criminalizing a bad thought plus an action just short of the greater public harm coming to fruition. The crime is complete once the perpetrator puts those thoughts down in a readable medium and puts the communication on its way in the direction of the target. When and where that item ceases its motion does not change the nature of the originating action—the sending—as being complete.

To say otherwise would be to make completion of the crime turn on whether an intermediary (*e.g.*, a postal worker, office staff, security detail) facilitates delivery to the target or makes the target aware of the threat. That, though, would be to change the nature of the offense that the Legislature defined. It chose to use the term "send," which focuses on what the perpetrator does, and to omit terms like "receipt" and "fear," which would turn the focus of the offense toward the effect on the target. The Legislature clearly decided not to define this crime in terms of the result at the other end of the perpetrator's transmission. *Cf.* 1 LAFAVE, SUBSTANTIVE CRIMINAL LAW § 6.4(a) (3d ed. 2017) (noting that "some crimes are so defined that conduct accompanied by an intention to cause a harmful result may constitute the crime without regard to whether that result actually occurs"); *id.* § 5.2(a)–(e) (discussing criminalization of intended conduct and intended versus actual results).

7

To illustrate, say a town has had a problem with scale-model boats littering the shore on one side of a lake. It determines that this was the result of too many amateurs testing their boats out on the lake from the opposite shore and then abandoning them. Not every boat floated ends up on the opposite shore; some come back, and some are retrieved. Cumulatively, though, there is a problem. The town adopts an ordinance that defines as an infraction the sending of scale-model boats from the one shore to the other. The town considers limiting the scope of the infraction to those circumstances where the boat reaches the shore at issue and is not retrieved, but it decides in favor of cutting the risk of any boats reaching the shore off at its root by making it an infraction simply to "send" the boat to the other shore.

After this ordinance is in place, a modeler comes to the shore with his boat. He puts his boat on the placid surface of the lake and gives it a push. Even without knowing which direction the bow is pointing or to where it floats, we can say that he *sent* his boat. That is, he gave the boat its motion when he cast it off and set it adrift—at a minimum at this point, he *sent* it. Add to this the preposition "to," and the object of that preposition indicates the boat's heading—the *intended* destination of that object put in motion. If the modeler pushes his boat on the water away from himself, with the bow pointing toward the shore across the way, he has *sent* the boat *to* the other side. That would be so even if a sudden stiff wind blows the boat back to him. His action increased the risk that he would contribute to the problem the town was trying to address, and the town decided to prohibit the creation of that risk rather than just those instances where the risk comes to fruition. The infraction here occurs as the town chose to define it: at the completion of the push of the boat in the direction of the other shore, regardless of whether it gets there.

This court's analysis in *O'Leary v. State*, 109 So. 3d 874 (Fla. 1st DCA 2013), is not inconsistent with this approach. In that case, the defendant had posted a threat toward a relative of one of his Facebook friends on his personal page. The question was whether the defendant "sent" the threat to the friend in violation of the statute. Before analyzing the question in earnest, the court mentioned an ostensible definition of "send" in *State v. Wise*, 664 So. 2d 1028 (Fla. 2d DCA 1995). *See O'Leary*, 109 So. 3d at 876.

8

This court characterized that decision as defining the term, as used in the statute, with two prongs: the submission of the communication for delivery and the receipt of that communication. *See id.* While we do not consider the *O'Leary* court as ultimately relying on this two-prong definition, we note two problems with relying on *Wise*. First, *Wise* was addressing a venue question (*viz.* whether the offense occurred both in the county from which the message was sent and in the county where it was received), not the proof necessary to support an element of the offense. Second, the *Wise* court lifted a definition of "send" from Black's Law Dictionary that in turn pulled from a provision of the Uniform Commercial Code, which is entirely inapposite. *See Wise*, 664 So. 2d at 1030.

Having mentioned *Wise*, seemingly in passing, this court concluded with an analysis that matches up with the analysis we set out above. The *O'Leary* court explained as follows:

> Here, appellant reduced his thoughts to writing and placed this written composition onto his personal Facebook page. In so doing, the posting was available for viewing to all of appellant's Facebook "friends." With respect to the posting in question, appellant had requested Michael O'Leary to be appellant's Facebook friend, a request that Michael accepted. *By posting his threats directed to his family member and her partner on his Facebook page, it is reasonable to presume that appellant wished to communicate that information to all of his Facebook friends.* . . . Had appellant desired to put his thoughts into writing for his own personal contemplation, he could simply have recorded them in a private journal, diary, or any other medium that is not accessible by other people. Thus, *by the affirmative act of posting* the threats on Facebook, even though it was on his own personal page, appellant *"sent"* the threatening statements to all of his Facebook friends, including Michael. Michael *received* the composition by viewing it.

*O'Leary*, 109 So. 3d at 877 (emphasis supplied).

I come back to the evidence before the jury and consider it in the light of this analysis. When Khayrallah hit "submit" on the message box at the clerk website, the jury rationally could have

9

concluded that he intended for his drafted communication to be transmitted in the "direction" of the chief judge. Put differently, the evidence supported a reasonable conclusion that Khayrallah "sent" his threat and completed the crime when he put his electronic message, expressly addressed to the chief judge (it stated it was meant for "Mark Mahon," after all), in virtual motion on a route that led to the chief judge. Khayrallah knew about the close working relationship between the clerk and the judges at the courthouse, so given the fact the chief judge's e-mail address was not publicly available, the pathway Khayrallah chose for his message was a reasonable choice to ensure his message got to the chief judge. As it turns out, the chief judge did receive the communication, but the point here is that the actions of intermediaries that facilitated or interfered with the delivery of the message were beside the point. It was enough that the jury reasonably could infer from the evidence presented that Khayrallah submitted the communication in a manner that he believed would facilitate reaching its mark.

The analysis is now at an end. There was competent, substantial evidence to support each of the three elements of the crime as explained to the jury in the instructions. I can find no error in the trial court's denial of the motion for judgment of acquittal, and as stated at the beginning, I would summarily reject his other contention of error. Khayrallah's conviction should stand. For these reasons, I concur in affirming.

LONG, J., concurring.

The State presented sufficient evidence that the electronic communication Khayrallah submitted to the clerk of court's online message system was both "sent" and was a "threat to kill or do bodily injury" to the chief judge of the Fourth Judicial Circuit. I therefore agree that the trial court's denial of Khayrallah's motion for judgment of acquittal must be affirmed.

_____

Jessica J. Yeary, Public Defender, and Danielle Jorden, Assistant Public Defender, Tallahassee, for Appellant.

10

Ashley Moody, Attorney General, and David Welch, Assistant Attorney General, Tallahassee, for Appellee.